In re John J. GOLDEN, Jr., Debtor.

**COMPUGRAPHIC CORPORATION, Plaintiff,**

v.

**John J. GOLDEN, Jr., Defendant.**

**Bankruptcy No. 85–0073–HL.
Adv. No. 85–105.**

United States Bankruptcy Court,
D. Massachusetts.

Sept. 19, 1985.

Kathleen M.K. Brahn, George P. Field, McCabe/Gordon P.C., Boston, Mass., for plaintiff.

Robert H. Minasian, Lawrence, Mass., for defendant/debtor.

Jeffrey A. Kitaeff, Rosenberg & Kitaeff, Lawrence, Mass., Trustee.

## MEMORANDUM ON NON–DISCHARGEABILITY OF A DEBT

HAROLD LAVIEN, Bankruptcy Judge.

John J. Golden, Jr. (the "debtor") filed a voluntary Chapter 7 petition in the United States Bankruptcy Court for the District of Massachusetts on January 22, 1985. Compugraphic Corporation ("Compugraphic"), the plaintiff, was listed as a disputed unliquidated creditor in the amount of $1.5 mil-

lion. On April 24, 1985, Compugraphic filed a complaint that sought determination that the debt owed by the debtor to it as non-dischargeable for fraud or similar misconduct pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).[1] In short, Compugraphic alleges that Golden, a Compugraphic manager, received kickbacks from an outside contractor while he utilized that same contractor at Compugraphic.[2] Trial was held on July 24, July 26, and August 1, and August 16, 1985. After reviewing the evidence presented, the memoranda of counsels, and the applicable law, I make the following findings of facts and rulings of law.

During the first fifteen years of Compugraphic's existence, as a duly organized Massachusetts corporation, manufacturer and distributor of graphic and photocomposition equipment, it managed its internal business systems with outside service bureaus. In the mid-1970's, Compugraphic began a period of rapid growth and decided to utilize an in-house Corporation Information Systems ("CIS") department which would, through the use of computers, assist in the internal management of the Compugraphics. In 1978, Compugraphics began its search for a corporate executive with expertise and experience to take over and expand the CIS department, and to create and implement new corporate information systems for Compugraphic's other departments. John J. Golden was interviewed by Compugraphic in the Spring of 1978. Golden represented that he had the qualifications and experience to fill the CIS position, and Compugraphic had no reason to doubt those representations. Indeed, those representations have never been doubted.

Golden was employed as Compugraphic's CIS department manager from July 5, 1978 to September 10, 1980. In that position, he worked 50 to 65 hours per week, and was paid a total of $124,000. Golden prepared the CIS department's annual budgets, which were reviewed and approved by Compugraphic's president and its vice president of finance. During the 27 months of Golden's employment, he was given broad discretion to spend in excess of $10,000,000 of corporate funds.

The CIS department utilized the services of independent contractors and consultants for certain projects. Outside computer programming consultants were necessary to upgrade the CIS systems as the department was growing faster than qualified employees could be hired. When Golden desired to procure money from the CIS budget for such services, he would prepare a purchase order requisition which named the vendor, stated in very general terms the nature of the requested services, and stated the total amount of money to be allocated to those services and, generally, included a range of hourly rates and, in at least one case, namely educational instruction, a daily rate. Typical requisitions described the requested services as "computer programming support as defined and directed by our Mr. John Golden" or as "educational instruction." Compugraphic relied on Golden to determine CIS's specific needs and to negotiate favorable terms. Golden would give each purchase order requisition to the vice president of finance, who would sign it and then, if the amount warranted it, direct it to the president for his signature. With these signatures, the requisition would be directed to Compugraphic's purchasing department which, as a routine matter, issued a blanket purchase order for the requested services.

The general non-specific nature of the requisition and subsequent purchase orders led directly to Golden's ability to abuse the process. Once the Compugraphic purchas-

---

1. There was, originally, also a claim under 11 U.S.C. § 727 which was waived in an amendment to the original complaint.

2. Compugraphic also instituted a state court proceeding against the debtor and others, which was removed to the district court and referred to me. After argument and after concluding the hearing against the debtor, the remaining state court action was remanded to the state court as a matter involving third parties and purely state law causes of action in which the bankruptcy estate was not involved.

ing department issued a purchase order for the procurement of services by the CIS department, a vendor's invoice against that order could be paid on Golden's signature alone. Compugraphic relied upon Golden's signature as his certification that the invoiced services were satisfactorily performed, billed at the agreed rates, and that the accounts payable department was authorized to pay the amount charged. Golden knew that his signature was accepted as such certification and he signed the invoices intending that his signature be relied upon. In light of Golden's position in the company, I find the aforesaid reliance was reasonable.

Paraskeva A. Traganos ("Traganos"), doing business as Digital Applied Technology Associates ("D.A.T.A.")[3] was one such independent contractor for computer programming, placement and consulting services. In September 1978, Golden first used funds from the CIS budget to retain Traganos as his "personal consultant for strategic planning." Shortly thereafter, Traganos became a major "supplier" of support services for the CIS department. From September 1978 to September 1980, when Compugraphic terminated Golden's employment, D.A.T.A. was paid over $800,-000 for alleged services supplied. At the same time, Golden received $104,113 from D.A.T.A.

Compugraphic contends that the amounts received by Golden constituted "kickbacks." Golden testified that in late December 1978, he began receiving payments from D.A.T.A. for services purportedly rendered by him as Traganos' "business consultant and a father figure sort of image for [Traganos] to fall back on." Between December 1978 and September 1980, Golden testified that he worked approximately 2,080 hours for D.A.T.A. in these capacities at a rate of $50 per hour. It is undisputed that Golden received $104,113 from D.A.T.A. during this time.[4] Golden's total compensation from Compugraphic was $124.000.

At trial, Golden was unable to describe any real services rendered by him to D.A.T.A. Golden testified that D.A.T.A. paid him for "thinking productive thoughts in his car" and doing "research" at his home. Golden testified that he spent 251 hours in 1979 teaching Traganos about a 10-day Harvard business course that Golden had taken in 1977. It strains the imagination to accept the testimony that Traganos would pay someone approximately $12,500 to tell him about a two-year old course that, in all likelihood, took less than 50 or 60 hours for Golden to attend. It would have been far simpler and productive for Traganos to take the course, himself. Equally incredible are the "six, seven, eight hours ..." at a time "talking on the phone" about "what avenue [Traganos] might go down," and the hundreds of hours that Golden claims he spent "preparing lists" of banks favorable to small businesses, and discussing, although not actually inspecting various buildings for the eventual relocation of D.A.T.A.

Golden attempted to characterize his arrangement with D.A.T.A. as "moonlighting." However, there is a difference between moonlighting generally, and allegedly working for your principal vendor.[5] Even if Golden had actually been providing services to D.A.T.A., those services would be in conflict with Golden's fiduciary duty to Compugraphic. Golden never revealed his arrangement for compensation from Traganos to any of his superiors. He defended the arrangement on two bases. First, it was common to moonlight and he had done it both before, and since. However, in answer to a question from the

---

**3.** In November 1979, Data, Inc. was incorporated as the successor in business and interest to Traganos and D.A.T.A., Traganos became the president of the new corporate entity.

**4.** In 1979, Golden received 22 checks from D.A.T.A. totaling $50,113 and, in 1980, 20 checks totaling $54,000.

**5.** All this at a time when Golden is working for Compugraphic 50–65 hours a week and Traganos is personally working as a consultant to Golden for 60 hours a week.

Court, he conceded he had never before or since moonlighted with a vendor. Second, with an amazingly rubbery ethical insensitivity, he pointed to the lack of an express prohibition against "moonlighting" in the company's "Vendor Relations Policy" which, with incredible gall, he offered in evidence. The Compugraphic "Vendor Relations Policy" stated:

Compugraphic employees are expected to deal with vendors in an efficient, fair, honest, and businesslike manner, so as to develop a good rapport.

B. *Dinner* and/or evening entertainment is strictly forbidden. This includes "tickets" to various sports functions. If, on an overnight visit to a vendor's plant, dinner and/or entertainment is permissable if offered.

C. *Gifts* of all types are forbidden under all circumstances, and employees are expected to vigorously refuse all gifts and explain that good parts, good service, and fast response when needed, are much preferred.

Items not considered as "gifts" would include items bearing vendor's advertising, items of small value, such as a box of candy, which is obviously for use by many employees.

D. If, occasionally, strict adherence to the above policy is apt to seriously disrupt the Compugraphic/vendor rapport, a deviation to the policy may be made, provided it is promptly reported to the Department Manager.

Apparently, in Mr. Golden's sense of equivalents, a dinner or tickets to sports events are more serious than a $100,000 secret payment. Further, D.A.T.A., which functioned as an executive placement firm, was informed in early 1979 by Compugraphic that it could not refer potential candidates to Compugraphic and supply consultant services at the same time because Compugraphic considered it a conflict of interest. Traganos complained to Golden of this decision, so Golden was certainly aware of Compugraphic's sensitivity in this area. Finally, Traganos testified that he had discussed with Golden whether any conflict would exist if Golden worked for D.A.T.A. —Golden, apparently, responded that it would not be any problem. There is no evidence that Golden ever discussed his relationship with D.A.T.A. at Compugraphic with any of his superiors nor received their permission to work for D.A.T.A.[6] Accordingly, I find that Golden did breach his fiduciary duty owed to Compugraphic. The next step is for the Court to examine the extent of any damage Compugraphic suffered as a result.

Specifically, at issue are three categories of "services" allegedly supplied. First, are the services supplied by Traganos, himself. From October 16, 1978 to June 29, 1979, Compugraphic was invoiced for 1,740 hours at rates ranging from $37.50 to $50 per hour. At one period of time, from March 1979 to June 1979, Traganos averaged over 60 hours per week. However, Compugraphic was unable to find any written product or any evidence that Mr. Traganos was on the premises other than a few hours a week. Further, despite page after page of testimony, neither Golden nor Traganos were able to describe Traganos as anything more than a "personal consultant" who familiarized Golden with the Honeywell equipment utilized by Compugraphics and provided assistance in strategic planning for the CIS department. No specifics were provided for the March/June 1979 period where Traganos averaged over 60 hours per week. Supposedly, at this time Golden was working 50–65 hours a week for Compugraphic and working as a consultant for Traganos. Accordingly, I find that Traganos' services regarding his personal consultations are greatly exaggerated and unjustified. As to the dollar amount of damages regarding this category, Compugraphic, in its analysis, gave credit for 30 hours per week. I therefore

---

6. At trial, Golden testified that he was not sure but that he may have mentioned his employment by D.A.T.A. to a superior, Mr. Lander, at a party. However, in light of Golden's equivoca- tion and Mr. Lander's denial of any such knowledge in his deposition, I find that Golden did not discuss the issue with Lander.

adopt Compugraphic's analysis, that the 624 hours paid for Traganos' time, in excess of 30 hours per week, represents overcharges of $30,437.50 that were approved by Golden for services he knew were not being rendered.

The second major category of billings were produced by consultants provided by D.A.T.A.. These services were supplied by five individuals—Buschel, Smith, Kormon, Rock, and Polite. The vast majority of these services were supplied by Buschel and Smith. During certain periods (July 1979 to January 1980 for Smith, October 1979 to August 1980 for Buschel), D.A.T.A. was consistently paid at hourly rates for 65 hours per week of Smith's and Buschel's time, whether they worked or not. Compugraphic contends that some or all of these amounts were overcharges wrongly and knowingly approved by Golden. It is undisputed that, before their "65-hour" arrangements commenced, both Smith's and Buschel's time was being billed and paid on D.A.T.A. invoices approved by Golden—on an hourly basis at sometimes substantially less than 65 hours per week. Although the "65–hour" arrangement represented increased charges, there was no corresponding increase in the amount or kind of work performed by either Buschel or Smith. However, it is also undisputed that both before and during the "65-hour" payment arrangement, both Buschel and Smith worked considerable hours. Buschel and Smith worked all hours of the day and night, both weekdays and weekends, providing software and hardware services. The "65-hour" arrangement was instituted because D.A.T.A., Buschel and Smith had difficulty with being on call for a 24-hours/7-day week basis without commensurate compensation. True, they worked at the other D.A.T.A. customer sites during the "65-hour" arrangement, but they were on 24-hour priority call for Compugraphic and would leave any other job site if Compugraphic needed them. Under such circumstances, the Court cannot find the "65-hour" arrangement either unjustified nor unreasonable.

At trial, much time was spent by the plaintiff in attempting to prove a correlation between the payments received by Golden and the payments received by D.A.T.A. attributable to the "65-hour" arrangement. There does appear to be substantial regularity to both groups of payments, which did not exist as to prior payments to Golden. While such regularity cannot be said with mathematical certainty to correlate to the "65-hour" billing, they account for $80,040 of the $104,113 paid to Golden. It would appear likely that they are the source of the payments to Golden. To charge him with the entire $104,113 as improper kickbacks, which I do, and not give him credit for this $80,040 as the source, would be to give Compugraphic a double recovery. Especially, since during the period from January 1980 to September 1980, the only alleged service supplied by D.A.T.A. was that for Buschel's "65-hour" arrangement. Thus the "kickbacks" as determined by the Court during the period from at least January 1980 to September 1980 could only have been for the "65-hour" arrangement.

The third major category of charges against Compugraphic which Compugraphic has criticized, is "educational" instruction supplied by D.A.T.A. from May 1, 1979 through December 21, 1979. D.A.T.A. was authorized to charge Compugraphic $540 per day for a maximum of 78 days of educational instruction (and a total maximum of $44,820). Traganos knowingly charged, and Golden knowingly approved, payments totaling $116,100 at the $540 rate. Further, although 65 days of Traganos' time were billed and approved by Golden at $540 per day for "onsite training at Compugraphic" between July 13, 1979 and September 28, 1979, Traganos admitted that none of that time had to do with training. Traganos also admitted that he had some expenses that had nothing to do with educational services, but because Golden was not allowed to pass along any expense that Traganos might have incurred in doing work for Compugraphic, Golden and Traganos knowingly charged those expenses as service performed by Traganos

at this daily rate. Traganos admitted that he would, for example, buy an airline ticket for $400 and bill it as an hourly or daily portion of educational services. I note that the educational instruction purchase orders contain no mention of expenses, which are presumably to be covered by the $540 daily rate specified. Finally, Traganos noted that on some occasions more than one training class was held per day. On those days, Compugraphic would be charged at $540 per training session. Although one might question the reasonableness of the $540 per training session, the purchase order was approved by the officer of Compugraphic and is not questioned as such. However, in regard to the dollar amounts attributable to this category, Compugraphic only authorized a total of 78 days at $540 per day (a total of $44,820) although $116,100 was invoiced and paid by Compugraphic. Golden's and Traganos' abuse of these charges are flagrant. Since Compugraphic did not prove that at least the 78 days of educational training was not provided, I find that $71,280 represents unjustified overcharges above the authorization of $44,820. Golden knowingly, willfully, and improperly authorized these payments in breach of the fiduciary duty he owed his employer.

In addition to the above charges, Compugraphic maintains that it was entitled to 15% volume and 2% prompt payment discounts. Aside from the comptroller who testified that volume discounts were common, there was no evidence offered of such discounts from other vendors and no distinction made between discounts for merchandise and as Golden testified, the negotiations that enter into setting a rate for personal services. In this case, we are dealing with negotiated hourly rates within a range in the approved purchase orders. There was no evidence of cheaper hourly rates from any other vendor or in the market, generally. I do not find that Compugraphic has sustained its burden of proof as to the hourly rates charged individually or generally. As to the 2% prompt payment discount, there was no evidence as to who negotiated this with this or other vendors, or even if this was a matter of negotiating or simply an automatic discount claimed by the accounts payable department. There is evidence that D.A.T.A. did give a 2% prompt payment discount starting in March, 1980, apparently at the insistence of the purchasing department. It would seem they could equally have claimed it either at the beginning or, retroactively, in March. On the evidence presented, this cannot be attributed to Golden.

The Court, having found that Golden's receipt of $104,100 in kickbacks led to Compugraphic sustaining damages above and beyond the kickbacks, must consider whether the kickbacks and the other damages constitute a non-dischargeable debt.

First, a recapitulation of Compugraphic's damages is in order:

1. $104,100 paid by Traganos or his entities to Golden, I find to be a kickback unrelated to any services rendered. Even if some small service was in fact rendered, there was a breach of Golden's fiduciary obligation to Compugraphic that inevitably increased the cost of Traganos' services as well as influenced Golden to approve invoices he knew were improper.

2. As a result, Golden allowed Traganos to bill $30,437.50 services he did not render, and the 65 hour invoices by Smith and Buschel account for $80,040 of the previously referred to kickbacks. Crediting $6,364.50 to avoid a double recovery (e.g., "if I pay $10 to buy something that actually cost $5 and you get a $2 kickback, I should get back the $5, but not $5 plus $2) results in $110,477.50 less $104,100. Three other employee's invoices are challenged, but the time records do not show any major discrepancies. Admittedly, Compugraphic shares any doubt, because although their investigation in 1980 caused various claims to be asserted that would require original records, they failed to protect and secure all of the necessary basic records or to account for work done by two of the employees at home.

3. Traganos admits not having performed educational services for the $71,280 excess educational billing. Furthermore, he admits to charging expenses and other non-educational items to this billing. In any event, these invoices were totally unauthorized by any purchase order.

Thus, the total claim against Golden caused by his breach of his fiduciary duty to Compugraphic totals $181,744.50.

11 U.S.C. § 523(a)(2)(A) excepts from discharge any debt "for money, property, [or] services, ... to the extent obtained by ... false pretenses, a false representation, or actual fraud ..." excepted from discharge in bankruptcy. Five elements must be present for a determination that such a debt is excepted from discharge:

(1) a false representation must be made by the debtor;

(2) known to be false at the time it was made;

(3) made with the intention and purpose of deceiving the creditor;

(4) which was reasonably relied upon by the creditor;

(5) which resulted in loss or damage to the creditor as a result of the false representation.

*In re Hill,* 44 B.R. 645, 646 (Bankr.D.Mass. 1984) (Lavien, J.), *citing In re Cokkinias,* 28 B.R. 304, 306 (Bankr.D.Mass.1983). *See also In re Valley,* 21 B.R. 674, 679 (Bankr. D.Mass.1982); *In re DeRosa,* 20 B.R. 307, 311 (Bankr.S.D.N.Y.1982).

■ Determinations of false representations and false pretenses may be made by consideration of direct evidence or by inference. *Cf. In re Bono,* 41 B.R. 629, 633–634 (Bankr.D.Mass.1984).

Intent to commit fraud may be either express or inferred under the circumstances of a particular case.

Direct proof of fraudulent intent is rarely available. Therefore, intent to deceive may be inferred when the totality of the circumstances presents *a picture of deceptive conduct by the debtor, which indicates that he did intend to deceive and cheat* the ... [creditor]. The repre-

sentation coupled with his conduct is sufficient to permit the court to infer the requisite intent.

*In re Schlickmann,* 6 B.R. 281, 282 (Bankr.D.Mass.1980) (emphasis added). "[S]ince few people will admit to a fraudulent intent, such intent may be established by circumstantial evidence." *Bono,* 41 B.R. at 631.

■ The use of invalid documents to obtain money constitutes a false representation sufficient to except the resulting debt from discharge. *In re Cloutier,* 21 B.R. 64, 66 (Bankr.D.Mass.1982); *see also In re Holston,* 47 B.R. 103, 108 (Bankr.M.D.La. 1985).

■ A creditor's reasonable reliance may take the form of an overt action in reliance, or an abstention from action that might otherwise properly be taken. *See In re Fields,* 44 B.R. 322, 328 (Bankr.S.D.Fla. 1984).

■ Golden routinely and systematically obtained for D.A.T.A. payments exceeding the amount legitimately owed to it by Compugraphic for consulting and programming services. Like Traganos and D.A.T.A., Golden ultimately received a share of the corporate funds he wrongfully diverted. To ensure a maximum return on his fraudulent activities, Golden assisted in the preparation of falsified invoices, *approved* those invoices for payment and, therefore, represented to Compugraphic that the invoiced services were actually rendered and billed at fair market rates. Because Golden held a position of trust and responsibility in the corporation, Compugraphic reasonably relied on his representations.

Golden's fraudulent intent to deceive Compugraphic may properly be inferred from the facts of this case. Some examples are: the unusual pattern of D.A.T.A. invoices approved by Golden versus payment to Golden by D.A.T.A., Golden's convenient lapses of memory during his testimony. These unrealistic and unacceptable explanations of his actions provide ample circumstantial evidence of false pretenses, false representations, and actual fraud.

Compugraphic has proven each of the elements of Section 523(a)(2)(A) of the Bankruptcy Code, and Golden's debt to Compugraphic is excepted from discharge on those grounds.

■ Compugraphic's claim against Golden, independent of Section 523(a)(2)(A), is non-dischargeable under Section 523(a)(4), "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny."

The two necessary ingredients for nondischargeability under this section as applied to this proceeding are (1) a defalcation (2) while acting in a fiduciary capacity.

■ "Defalcation includes the failure of a fiduciary to account for money he received in his fiduciary capacity." *In re McCurdy*, 45 B.R. 728, 731 (Bankr.M.D.Pa. 1985); *In Matter of Dyer*, 4 B.C.D. 939 (Bankr.N.D.Ga.1978). A defalcation of a fiduciary is distinguished from fraud in that the same showings of moral turpitude or intentional wrong are not required. *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2nd Cir., 1937).

As stated by Judge Learned Hand:
"Whatever was the original meaning of 'defalcation,' it must here have covered other defaults than deliberate malversations, else it added nothing to the words, 'fraud or embezzlement.' "

. . .

We do not hold that no possible deficiency in a fiduciary's accounts is dischargeable; *In re Bernard*, 87 F.2d 705, 707, we said that the misappropriation must be due to a known breach of duty, and not to mere negligence or mistake: although that word probably carries a larger implication of misconduct than 'defalcation', 'defalcation' may demand some portion of misconduct; we will assume arguendo that it does."

■ "Fiduciary capacity" within the meaning of Section 523(a)(4) may be found in an employment relationship. In *In re Entrekin*, 40 B.R. 435, 436 (Bankr.S.D.Fla. 1984), the court held that the debtors, employed as computer programmers, held fi-

duciary positions which allowed them to control disbursement of their employer's funds. *Id.* at 436. *See also In re Eisner*, 35 B.R. 86 (Bankr.N.D.Ohio 1983) (corporate officer who was in a position to divert payments from a lockbox account was held to be acting in a fiduciary capacity); *Airo Supply Co. v. Page*, 2 Ill.App.2d 264, 270–273, 119 N.E.2d 400, 402–404 (1954) (bookkeeper, in sole charge of the plaintiff/employer's cash accounts, was a fiduciary under the Bankruptcy Act); *General Insurance Company of America v. Klein*, 517 S.W.2d 726, 729 (Mo.Ct.App.1974) (general manager occupied a position of trust which he breached by misappropriating his employer's funds).

While at Compugraphic, Golden occupied a position of trust, was in control of corporate property, and was given responsibility for the maintenance and disbursement of corporate funds to vendors. Over the course of his 27 months at Compugraphic, Golden received in excess of $10 million for use in the CIS department. He misapplied substantial amounts of these funds, and at least $104,113 of Compugraphic's corporate funds went directly to Golden in the form of "kickbacks" from Data. Indeed, Golden was only able to set this train of events resulting in unauthorized, exaggerated, false invoicing and kickback because of the level of his authority in Compugraphic and confidence and trust that the company placed in him.

Golden, by taking kickbacks in the form of a secret consulting job with one of his major vendors engaged in a defalcation while acting in a fiduciary capacity. As a direct result, he damaged his employer, Compugraphic, to the extent of $181,744.50, all as itemized, *supra*. Therefore, under 11 U.S.C. § 523(a)(4), Golden's obligation of $181,744.50 is nondischargeable.

Compugraphic's complaint also seeks to have the obligations determined non-dischargeable under the embezzlement or larceny sections of § 523(a)(4), and the willfull and malicious provisions of § 523(a)(6). As the matter has been decided on two other grounds, I find it unnecessary to prolong

this opinion by expressing an opinion on these more difficult issues.

One last issue requires a comment. This is not a case of simple second guessing a good-faith business judgment as might have been involved in such cases as *In re McCurdy*, 45 B.R. 728 (Bankr.M.D.Pa.1985) or *In re Carneal*, 33 B.R. 922, 925 (Bankr. E.D.Va.1983). The entire pattern of Golden's activity is one of total insensitivity to the conflict of interest position he placed himself in by making a secret deal with a principal supplier to be paid $104,000.00, an amount almost equal to his total salary and concurrently authorizing invoices known to be false such as the educational instruction invoices. Just one more example is the certifying of invoices in his last week of employment so that he could get a last $5,000 kickback from Traganos "for services rendered", that even Traganos admits were not rendered.

While it appears that only certain of the overcharges to Compugraphic accrued to the direct benefit of Golden, it is clear that the totality of these damages was sustained as a result of the secret relationship between Golden, D.A.T.A., and Traganos. Indeed, Golden may well have been denied the opportunity to receive "kickbacks", but for his willingness to provide similar financial rewards to his scheming partner. In short, while Golden was the direct beneficiary of a component of the scheme, he was an indirect beneficiary of the entire illicit relationship with Data and Traganos. *In re Shinew*, 33 B.R. 588, 593–594 (Bankr.N. D.Ohio 1983).