In re Frank **TROVATO**, Debtor.

**CHICAGO MIDWEST CREDIT SERVICE CORPORATION,**
**Plaintiff,**

v.

**Frank TROVATO, Defendant.**

**Bankruptcy No. 87 B 09641.**
**Adv. No. 88 A 0006.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

June 26, 1991.

---

**576**

Michael T. Reid, Thomas E. Roche, Halfpenny, Hahn & Roche, Chicago, Ill., for Chicago–Midwest Credit Service Corp.

John H. Redfield, Chicago, Ill., for Frank Trovato.

Peggy Wallace, Chicago, Ill., for Thomas E. Raleigh, Trustee in Bankruptcy.

## MEMORANDUM OF OPINION

EUGENE R. WEDOFF, Bankruptcy Judge.

This adversary proceeding is before the court for entry of judgment following trial. At issue is a complaint to determine the dischargeability of debts that the plaintiff, Chicago Midwest Service Corporation "Chicago Midwest", alleges that it is owed by the debtor/defendant, Frank Trovato, for funds that Trovato acquired while working for Chicago Midwest. For the reasons stated below, although Chicago Midwest amply proved its allegations of wrongdoing by Trovato, parties other than Chicago Midwest hold nondischargeable debt on account of most of Trovato's misconduct and Chicago Midwest is entitled to judgment on only a portion of the debt asserted in its complaint.

## FINDINGS OF FACT

Chicago Midwest is a subsidiary of Chicago Midwest Credit Management Association (the "Association"), a trade association of credit managers. (Transcript of Jeanette Zolkewitz testimony at proceedings at pages 153–154) (hereinafter "Tr. (witness) at — "). One of the functions that Chicago Midwest provides is that of a collection agency for members of the Association—it accepts members' accounts for collection when the members' own efforts to collect the accounts prove unsuccessful. (Tr. Zolkewitz at 164.) Chicago Midwest generally limits its services to members of the Association. (Tr. Zolkewitz at 162.)

At the time relevant to this proceeding, Chicago Midwest charged Association members a standard fee for collection services, usually 25% of the amount actually collected (35% when the matter involved foreign accounts). (Tr. Zolkewitz at 185–187.) The contingency fee would be deducted by Chicago Midwest from the amount recovered on an account before the check for the balance of the recovery was prepared and transmitted to the Association member. (Tr. Zolkewitz at 196.) If an account required the services of a lawyer in order to be collected, Chicago Midwest

would arrange for this representation, but the member would be responsible for payment of the lawyer's fees and expenses in excess of the contingency payment.

Frank Trovato was employed by Chicago Midwest from 1968 through January 24, 1986 as supervisor of its collectors. (Tr. Zolkewitz at 164–165.) One of Trovato's duties in this position was to retain lawyers on behalf of members of the Association whenever their delinquent accounts, referred to Chicago Midwest, required litigation. (Tr. Zolkewitz at 166 and 173–176.) In such cases, Trovato acted as an intermediary between the members and their attorneys. Once an account was forwarded to Chicago Midwest by a member and an attorney was retained by Trovato, all attorney/client communications regarding the delinquent account were channelled through Trovato. (Tr. Feingold at 30–31.)

In addition to his duties on behalf of the collection department, Trovato would regularly handle accounts given to him by Bernard Chaitman, manager of the Chicago Midwest adjustment department. (Tr. Chaitman at 493–95.) On accounts given to him by Chaitman, Trovato earned a commission on collections, but no commission was paid to the Chicago Midwest collection department on these accounts. (Tr. Chaitman at 500–501.)

The evidence at trial established, clearly and convincingly, that Trovato, in four different ways, manipulated the procedures of Chicago Midwest to divert funds to himself.

The first method Trovato employed was a kickback scheme involving the lawyers he retained on behalf of members of the Association. This "lawyer kickback" scheme involved the extra charges to Association members that were required when a lawsuit had to be filed. The attorneys that Trovato retained would inform Trovato that they required a retainer or advance against expenses in a particular amount. Trovato would then advise the Association member to make a payment to the attorneys in an amount greater than what the attorneys actually requested, and the client would forward a check in the inflated amount to the attorneys through Trovato. (Tr. Feingold at 58–65 and 131–135.) Trovato would then arrange for the excess amount of the check to be paid by the attorneys into the account of the Drugs No Thanks Club (or "DNTC") (Tr. Feingold at 52–54 and 71–72), an enterprise that Trovato controlled and used for his personal benefit.[1] Through the lawyer kickback scheme, Trovato received a total of $46,-425.[2] Chicago Midwest has not been able to determine the identity of the clients who were required to pay the excess retainers and expenses. (Tr. Zolkewitz at 209–210.)

Trovato's second scheme involved kickbacks from the collection of foreign accounts, which Trovato referred to International Exchange Techniques (Intertex), a firm headed by Victor Carter. Trovato forwarded international accounts to Intertex for collection only after receiving Carter's agreement to pay Trovato (by check payable to DNTC) 20% of the fee that Intertex received from Chicago Midwest. Since Intertex received 10% of the amounts collected on the accounts referred by Chicago

---

**1.** Trovato testified that DNTC was a charitable, non-profit organization to which members of the Association and the attorneys representing them made voluntary contributions. (Tr. Trovato at 302–04, 313–24, 339–340 and 385–86.) This testimony was entirely unbelievable: the supposed contributors testified that they had no intention of making charitable contributions when they made deposits to DNTC at Trovato's request (e.g., Tr. Feingold at 85); there was no documentation of any charitable activity by DNTC; and there was substantial evidence that DNTC funds were used for personal expenses of Trovato (Tr. Trovato at 437–43 and 477–78 and Plaintiff's Ex. 217–67). Considering these fac-

tors, as well as Trovato's demeanor as a witness, the court was left with a firm conviction that Trovato gave deliberately false testimony.

**2.** The sources and amounts of the receipts were: Feingold, Lang & Levy—$38,125; Garleck, Cohen & Fishman—$3,000; Lawrence S. Lichtenstein (Mesirov, Gelman, Jaffe, Cramer & Jameson)—$1,500; and Martin P. Schachat—$3,800. (Plaintiff's Ex. 11–98 and 100–103.) Trovato asserted that the $3,000 received from Garleck, Cohen & Fishman was later returned by DNTC (Tr. Trovato at 321–22); but whether this assertion is accurate, it is not necessary to the disposition of this matter to determine the veracity of this statement.

Midwest, Trovato received 2% of the collections recovered by Intertex. The total received by Trovato in this manner was $2,166.20. (Plaintiff's Ex. 105–116.)

Third, Trovato obtained funds by forging endorsements of payees on debtor checks and directing payment of these checks to DNTC. (Tr. Zolkewitz at 230–234.) Amounts collected on these accounts, a total of $1,287.88 were thus paid to DNTC, rather than the creditors to whom they were due. (Tr. Feingold at 97–98.)[3]

Finally, Trovato collected a number of accounts using DNTC as the collection service so that DNTC, rather than Chicago Midwest, received the commissions. The files for these accounts were not opened according to the regular procedure at Chicago Midwest for members' accounts; nor did customary Chicago Midwest documentation exist for them. (Tr. Zolkewitz at 168–173 and 215–217.) Instead, the accounts were handled outside the Chicago Midwest system by Trovato (Tr. Zolkewitz at 234–237) without any connection with the Chicago Midwest collection department (Tr. Dearhammer at 510) in much the same manner as the collections Trovato handled for Chaitman were handled. The fees generated on the collection of these accounts totalled $1,593.33. (Tr. Feingold at 97–98 and 104–111; and Zolkewitz at 234.)[4] In a variation of this scheme, Trovato directed Crown Orchards, an entity for whom Trovato was pursuing a collection outside the Chicago Midwest system, to pay DNTC $1,500 for "legal services." (September 13, 1988 Deposition of Henry M. Chiles at 7–9, admitted into evidence at hearing, and Plaintiff's Ex. 127.)[5]

Trovato was fired by Chicago Midwest after his misconduct was discovered, and he filed his bankruptcy petition shortly thereafter. Chicago Midwest then filed the pending complaint to determine dischargeability under 11 U.S.C. § 523(a)(2)(A) and (a)(6). Chicago Midwest has pursued this matter purely in its own interest and not as an agent or representative of the members of the Association or of Intertex. (Tr. Dearhammer at 509–511.) Chicago Midwest has not asserted any claims against Trovato for lost business due to the extra costs he imposed, nor has Chicago Midwest asserted any claim against Trovato for that portion of his salary paid to him while he was engaging in activities outside the scope of his employment with Chicago Midwest or for the costs of Chicago Midwest staff or supplies used by Trovato while engaging in non-Chicago Midwest activity. Rather, Chicago Midwest has limited its proof of indebtedness to the sums of money that were paid into DNTC in connection with Chicago Midwest business.

## CONCLUSIONS OF LAW

The complaint of Chicago Midwest in this matter seeks a determination that debts of Frank Trovato, arising out of his manipulation of collection accounts, are nondischargeable—either because Trovato obtained funds through "false pretenses, a false representation, or actual fraud" (11 U.S.C. § 523(a)(2)) or because Trovato committed "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" (11 U.S.C. § 523(a)(4)).

In order for a debt to be nondischargeable under either of the theories forwarded by Chicago Midwest, "the creditor to whom such debt is owed" must bring the complaint, pursuant to Section 523(c) of the Bankruptcy Code (Title 11 U.S.C., the

---

3. The payor, payee, and amount of the checks were: Pizza Etc. to National Collection—$250.00; Carmen's to Lakeland Foods—$115.90; Pronto Pizza to Lakeland Foods—$250.00; Pizza Stop to Lakeland Foods—$75.00; Pizza Etc. to National Collection—$344.32; Revinia Deli to Lakeland Foods—$81.91; and Paesanos to Lakeland Foods—$170.75. (Plaintiff's Ex. 118–120, 122–124 and 126.) National Collection was an entity not described at trial which shared DNTC's post office box. (Plaintiff's Ex. 5 and Defendant's Ex. 7.)

4. The sources and amounts of these receipts were: Lakeland Foods to DNTC—$1,126.68 and Lakeland Foods to DNTC—$466.65. (Plaintiff's Exhibits 117 and 125.)

5. In contrast to the other accounts for which DNTC was used as a collection service, Chicago Midwest deducted its standard 35% contingency fee upon settlement of the Crown Orchards account. (Chiles Deposition at 38–39.)

"Code"). Thus, in *In re Cannon,* 741 F.2d 1139, 1141 (8th Cir.1984), the Eighth Circuit held that, pursuant to Section 523(c), a state government had no standing to seek determinations that restitution debts owed to its citizens were nondischargeable. Similarly, in *In re Hanson,* 104 B.R. 261, 262 (Bankr.N.D.Cal.1989), the court relied on Section 523(c) in refusing to allow a class action to determine the dischargeability of debts under Section 523(a)(2) ("There is no provision which would allow for a creditor to seek determination of the dischargeability of someone else's claim").

■ Does Chicago Midwest have its own claim against Trovato? That is a question that must be determined under nonbankruptcy law. As the United States Supreme Court pointed out in *Grogan v. Garner,* 498 U.S. 279, ——— ———, 111 S.Ct. 654, 667–68, 112 L.Ed.2d 755 (1991), there are two parts to a dischargeability action. First, the creditor must establish a valid claim against the debtor or the estate.[5] The validity of such claims is determined by the "nonbankruptcy law that creates [the] substantive claims." 498 U.S. at ———, n. 9, 111 S.Ct. at 658 n. 9. Only after the creditor has established a valid claim under nonbankruptcy law does the issue of nondischargeability of that claim arise under the terms of the Code. 498 U.S. at ———, 111 S.Ct. at 658. In this case, as to the bulk of its legal theories, Chicago Midwest has simply failed to show that it (as opposed to its clients) has a valid claim, under nonbankruptcy law, against Trovato.

■ The largest part of the DNTC payments came from the first scheme, the lawyer kickbacks. In this scheme, as outlined above, Chicago Midwest collected its full 10% commission on the amounts collected from accounts of its clients—members of the Association—but the clients

were required to pay inflated litigation charges to lawyers retained on their behalf by Trovato, with the excess charges deposited into DNTC. As a result of this scheme, the clients of Chicago Midwest were defrauded—Trovato intentionally misrepresented to them the amount of the litigation charges, with intent to deceive, and the clients paid the inflated charges in reliance on the misrepresentations, to their detriment. This gives the clients a valid claim against Trovato under Illinois law. *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.,* 131 Ill.2d 145, 165, 137 Ill.Dec. 19, 28, 545 N.E.2d 672, 681 (1989) (elements of fraud).[6] However, there was no showing that Chicago Midwest received any misrepresentation from Trovato, took any action in reliance on the misrepresentations that Trovato did make, or, indeed, that Chicago Midwest was harmed by these misrepresentations, since it obtained its full commission on the overcharged accounts. Thus, with respect to the lawyer kickbacks, Chicago Midwest has not established that it has an underlying, substantive fraud claim against Trovato that might be nondischargeable under Section 523(a)(2) of the Code.

In this connection, it is important to distinguish the single decision cited by Chicago Midwest, *In re Golden,* 54 B.R. 957 (Bankr.D.Mass.1985). In *Golden,* a debtor was found to have committed fraud in connection with kickbacks he received from a vendor who supplied consulting services to the debtor's employer. However, the finding of fraud was not based on the kickbacks, but on the fact that the debtor submitted false invoices for the vendor, and that his employer, in reliance on those invoices, made excessive payments. 54 B.R. at 963. Thus, the employer in *Golden* is in the same position as the clients of Chicago

5. The Court actually refers to a claim "against a bankrupt estate" (498 U.S. at ———, 111 S.Ct. at 657) as the first requisite of a dischargeability complaint, but a creditor may pursue a complaint to determine the dischargeability of a debt without actually filing a claim against the estate, as commonly occurs in no-asset Chapter 7 cases.

6. Because the clients of Chicago Midwest were not included in Trovato's schedule of creditors as filed in connection with his Chapter 7 action, they may seek to enforce his obligations to them pursuant to Section 523(a)(3)(B) of the Code. *See In re Mendiola,* 99 B.R. 864 (Bkrtcy.N.D.Ill. 1989) (no time bar to filing of complaints based on Section 523(a)(2), (4) or (6) if notice of bankruptcy not received).

Midwest in the present case—paying more than the proper amount for services in reliance on the debtor's false representations. Chicago Midwest itself is not in that position.

The *Golden* decision also involves a second ground on which Chicago Midwest asserts a claim against Trovato: defalcation, embezzlement and larceny. However, these terms again refer to substantive causes of action, under Illinois law, that Chicago Midwest cannot assert with respect to Trovato's lawyer kickback scheme. "Defalcation" has generally been defined as "the failure of one who has received money in trust or in a fiduciary capacity to account and pay over as he ought" or "the failure of a public officer to account for moneys received by him in his official capacity." 26A C.J.S. *Defalcation* 125 (1956). Illinois decisions use the term in this sense, but not as defining a cause of action. Thus, for example, in *Landau v. Landau*, 409 Ill. 556, 562, 101 N.E.2d 103, 107 (1951), the Illinois Supreme Court referred to possible breaches of trust as "debts or defalcations" by the trustee, and in *People ex rel. Davis v. City of Chicago*, 124 Ill. 636, 637, 17 N.E. 56, 57 (1888), the court referred to the failure of a city treasurer to account for public funds as a "defalcation." "Embezzlement" and "larceny" did define actual causes of action in Illinois, but they were criminal offenses, not civil actions, each involving taking of another's property. As explained in *People v. Stevens*, 358 Ill. 391, 404, 193 N.E. 154, 159 (1934),

> Embezzlement differs from larceny in that in the former the original possession is lawful, as the accused acquires possession of funds or property by reason of the relation of principal and agent. The gravamen of the offense consists in the subsequent conversion of property so received.[7]

Thus, the civil actions involved in defalcation, embezzlement and larceny are conversion or breach of trust. Since Chicago

Midwest was not the owner or beneficiary of any funds converted or misapplied by Trovato in the course of the lawyer kickback scheme, Chicago Midwest has no valid claim against Trovato on these theories.

Again, the comparison with *Golden* is instructive. There, the employer entrusted the debtor with more than $10 million of its funds, which the debtor misapplied. 54 B.R. at 964, Trovato's scheme of lawyer kickbacks, by contrast, involved no funds belonging to his employer.

■ This is not to say that Chicago Midwest has no potential claim against Trovato under Illinois law. The common law imposes a duty of loyalty on employees (as on all agents), forbidding them from taking action against the interests of their employers (or other principals). Restatement (Second) of Agency § 387 (1958) ("Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency.") Illinois law recognizes this principle. *Simpson v. Compagnie Nationale Air France*, 42 Ill.2d 496, 498–99, 248 N.E.2d 117, 119 (1969) ("If Larkin were truly the agent of Air France, then the airline could demand damages for any failure of the agent to act in its best interests.") A corollary to the general duty of loyalty is that "an agent who makes a profit in connection with transactions conducted by him on behalf of the principal is under a duty to give such profit to the principal." Restatement (Second) of Agency § 388 (1958). Under this theory, Chicago Midwest might well have a claim against Trovato for the lawyer kickbacks he received in connection with servicing the needs of Chicago Midwest's clients.

■ However, even if Chicago Midwest does have a valid state law claim against Trovato for breach of the duty of loyalty, it would still have to demonstrate that the claim was nondischargeable under the provisions of the Bankruptcy Code. Chicago

---

7. The present Illinois Criminal Code abolishes the distinctions between embezzlement and larceny, combining both in its definition of "theft." Ill.Rev.Stat. ch. 38 ¶ 16–1 (1989). *See People v.*

*McCarty*, 94 Ill.2d 28, 34, 67 Ill.Dec. 818, 821, 445 N.E.2d 298, 301 (1983) (discussing committee comments to the Criminal Code).

Midwest has not done so. Agency is not the kind of "fiduciary capacity" that gives rise to nondischargeability under Section 523(a)(4) of the Code. *In re Twitchell*, 91 B.R. 961, 964–65 (D.Utah 1988) ("The term 'fiduciary capacity' as defined by federal law, applies only to technical trusts, express trusts, or statutorily imposed trusts and not to fiduciary relationships which arise from an equitable or implied trust or an agency relationship."); *In re Hutton*, 117 B.R. 1009 (Bankr.N.D.Okl.1990) (examining the historical background of Section 523(a)(4) in holding that a director and officer of a corporation does not act in a "fiduciary capacity" for purposes of dischargeability).[8]

Thus, although Trovato's lawyer kickback scheme is reprehensible, and gives rise to nondischargeable claims on behalf of the clients of Chicago Midwest, it has not been shown to give rise to a nondischargeable claim on behalf of Chicago Midwest itself.

Trovato's remaining misconduct can also be analyzed under the principles set forth above. Where Trovato endorsed client settlements to DNTC, he plainly converted the property of the clients. This conversion gave rise to a claim on behalf of the clients that would be nondischargeable—most clearly under Section 523(a)(6) of the Code, which applies to willful and malicious injury to the property of another. The settlement proceeds, however, did not belong to Chicago Midwest, and it has shown no basis for a claim to them other than on a theory of breach of loyalty, which does not make the claim nondischargeable. Similarly, by performing collection services through DNTC rather than through Chicago Midwest, Trovato plainly breached a duty of loyalty, but once again did not commit a fraud or misappropriate funds of Chicago Midwest. This claim, too, cannot be found nondischargeable.

The only activity of Trovato that does give rise to a nondischargeable claim is the kickback scheme involving Intertex. On the accounts handled by Intertex, Chicago Midwest received 35% of the settlement proceeds, and then paid 10% of the proceeds to Intertex. Trovato, in effect, negotiated with Intertex to reduce its share of the proceeds to 8%. As a result, Chicago Midwest should have been able to pay less of its commission to Intertex. Instead, however, Trovato converted the commission he had saved Chicago Midwest by directing its deposit into DNTC. Thus, in this instance, Trovato did divert to himself funds that belonged to Chicago Midwest, and thus is liable for embezzlement of these funds, giving rise to a nondischargeable claim under Section 523(a)(4), as alleged by Chicago Midwest. The amount of this claim is $2,166.20. In all other respects, Chicago Midwest is not entitled to a judgment of nondischargeability against Trovato.

## CONCLUSION

For the reasons stated above, Chicago Midwest has established that it has a nondischargeable claim against Frank Trovato in the amount of $2,166.20, pursuant to Section 523(a)(4) of the Bankruptcy Code. Judgment will be entered, by separate order, in conformity with this determination.

---

**8.** The *Golden* decision holds, contrary to the authorities cited here, that an employment relationship may give rise to "fiduciary capacity." 54 B.R. at 964. However, each of the cases cited in *Golden* for this proposition, and the *Golden* case itself, are ones in which an employee misappropriated funds of the employer, and thus a nondischargeable debt was created by embezzlement, with no need to find a fiduciary relationship. *Cf. In re Hutton*, 117 B.R. 1009, 1014 n. 2 (Bankr.N.D.Okl.1990), in which the court similarly distinguished authority holding that the director of a corporation acted in a "fiduciary capacity."