RUDOLPH F. DOLEZAL, Plaintiff-Appellant and Cross-Appellee, v. PLASTIC AND RECONSTRUCTIVE SURGERY, S.C., Defendant-Appellee and Cross-Appellant.

First District (6th Division)   No. 1—93—1461

Opinion filed September 30, 1994.

Daniel P. Hogan and P. Matthew Glavin, both of Ross & Hardies, of Chicago, for appellant.

Ralph E. Brown and Michael F. Braun, both of Schuyler, Roche & Swirner, of Chicago, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Rudolph Dolezal, M.D., appeals from an order of the circuit court of Cook County declaring his employment with defendant, Plastic & Reconstructive Surgery, S.C. (PRS), to have been properly terminated and further declaring the parties' noncompetition agreement to be valid and enforceable against him. PRS cross-appeals from the trial court's order entering summary judgment in plaintiff's favor on its causes of action against plaintiff for breach of fiduciary duty and breach of contract.

The relevant facts are as follows. In the summer of 1984, plaintiff accepted an offer to join PRS, located adjacent to Lutheran General Hospital in Park Ridge, Illinois. Codefendant Richard Schultz, Sr., M.D., was the sole physician practicing at PRS and also the sole shareholder. On July 30, 1984, Dolezal and PRS, by Schultz, executed a letter agreement which summarized the basic agreements relating to their association. The agreement specified that the parties intended their association "to result in the orderly transfer of ownership of [PRS] and [the] medical practice of Schultz upon the retirement of Schultz." The agreement contained a section entitled "Termination of Employment," which outlined the entitlements owing to Schultz and Dolezal in the event either terminated his employment with PRS. The agreement also expressly contemplated the execution of a formal employment agreement as well as a formal stock purchase and repurchase agreement. The letter agreement specified that "all corporate actions shall be consistent with the spirit and intent of this association agreement." Finally, the agreement directed that a $250,000 senior consulting fee would be paid by plaintiff to Schultz in $50,000 installments over a five-year period. Plaintiff paid Schultz the last installment in late 1990.

Plaintiff began his employment with PRS on August 1, 1984. One month later, PRS's attorney forwarded to him a draft employment agreement, noncompetition agreement and stock purchase and repurchase agreement, along with an additional copy of the letter agreement. Plaintiff executed the three new agreements in October 1984.

The employment agreement specified that it was to continue on a year-to-year basis after December 31, 1987, and gave PRS the right to terminate the agreement by the approval of 60% of the holders of PRS's outstanding shares of stock. In the event PRS chose to exercise this right, the agreement stated that PRS was to give plaintiff 90

days' notice to this effect. The agreement also gave plaintiff the unconditional right to terminate the employment relationship upon 90 days' written notice to PRS.

The employment agreement contained a provision prohibiting plaintiff from engaging in the practice of plastic, reconstructive, and otolaryngology medicine and surgery for anyone other than PRS without the consent of PRS's board of directors for as long as the agreement remained effective. The agreement provided that any fees derived from medical services rendered outside PRS would accrue to PRS unless prior approval was granted by the board of directors.

The noncompetition agreement provided that plaintiff was prohibited from competing with PRS, within a seven-mile radius of PRS's Park Ridge office, in the field of plastic, reconstructive or otolaryngology medicine for a period of three years after the date of termination from PRS. Plaintiff was not prohibited from thereafter maintaining a practice at Good Shepherd Hospital in Barrington, Holy Family Hospital in Des Plaines, and Northwest Community Hospital in Arlington Heights.

The stock purchase and repurchase agreement permitted plaintiff to acquire 5% of the outstanding shares of PRS stock each year until he acquired a total of 40%. Under the agreement, plaintiff was not entitled to acquire more than 40% of the stock until Schultz retired. At that time, PRS had the first option to purchase the remaining shares of stock. Upon the termination of plaintiff's employment with PRS, either PRS or Schultz was obligated under the agreement to repurchase the shares of PRS stock held by plaintiff.

By 1988, the relationship between Schultz and plaintiff had become strained. Schultz believed the office staff was misreferring patients from him to plaintiff. Plaintiff himself noted the "numerous and pervasive disagreements" between him and Schultz involving "most aspects of office staffing, patient referrals and billings, insurance coding of medical procedures, collections, corporate expense approvals, documentation and coding (as shared or individual expenses), the need for an audit, and advertising of PRS services."

Schultz subsequently learned that during the late summer and fall of 1991, plaintiff was treating patients at PRS's office for whom no billing or medical records were retained. On November 18, 1991, Schultz notified plaintiff by letter that his employment with PRS would terminate on February 26, 1992.

In December 1991, plaintiff filed a four-count complaint against PRS and Schultz. In count I, plaintiff alleged that PRS and Schultz breached the employment agreement (consisting of the letter agreement and subsequent agreements) by wrongfully terminating

his employment; in count II, plaintiff petitioned the court to dissolve PRS; in count III, plaintiff petitioned the court to appoint a receiver to operate PRS's business affairs; and in count IV, plaintiff alleged that Schultz breached his fiduciary duties to PRS.

PRS and Schultz subsequently filed a four-count counterclaim seeking in counts I and II, respectively, declarations that the company had properly terminated plaintiff and that the noncompetition agreement was valid and enforceable, and alleging in counts III and IV, respectively, that plaintiff had breached the employment agreement and his fiduciary duties to PRS by treating patients at various hospitals without passing the fees derived therefrom to PRS, and by treating his patients from a separate practice he had established in Lake Forest in 1989 at PRS's office without creating medical records for PRS's use and without passing the fees on to PRS. Counts III and IV also alleged that the act of establishing the Lake Forest practice was a breach of the employment agreement and also a breach of his fiduciary duty. The trial court issued an order holding plaintiff's termination in abeyance pending its decision as to whether the termination was proper.

On December 18, 1992, plaintiff filed a motion requesting the trial court to set a trial date. At this time, PRS advised the court that plaintiff's deposition was to be completed in January 1993, and it informed plaintiff and the court that it contemplated filing a motion for summary judgment thereafter. Counsel for plaintiff responded that there would still be triable issues remaining, and notwithstanding knowledge of PRS's intent to file a summary judgment motion, it requested a March 1993 trial date. The trial court set a trial date of March 22, 1993.

Following the completion of plaintiff's deposition, PRS, on February 16, 1993, filed a motion for summary judgment on counts I and II of its counterclaim. The motion was noticed for hearing on February 26, 1993. At that time, the trial judge assigned to the case was not sitting, and another judge entered an agreed order entering and continuing the motion to March 8, 1993.

At the March 8, 1993, proceeding, plaintiff objected to going forward on the summary judgment motion, claiming that it had not been timely filed. Over plaintiff's objection, the court ordered that the motion be heard on the morning of March 22.

On March 22, the trial court, after considering the arguments of counsel, granted summary judgment in favor of PRS as to counts I and II of its counterclaim. The court determined that the facts surrounding plaintiff's termination were not in dispute and that the issue of the propriety of his termination was a matter of contract in-

terpretation. The court held that the employment agreement clearly and unambiguously provided that plaintiff's employment with PRS could be terminated by the approval of 60% of the holders of the outstanding shares of PRS stock upon 90 days' notice. The court concluded:

> "The employment agreement gave [plaintiff] exactly the same right to terminate the agreement upon the exercise of his own unilateral option *** and the giving of ninety days prior written notice to [PRS].
>
> \* \* \*
>
> *** [T]he employment status was the equivalent of an at will employment relationship, conditioned only on *** ninety days prior notice. Either side could terminate under this contract for any cause or no cause.
>
> The plaintiff's complaint seemingly ignores the mutual rights to terminate and alleges that the employment agreement was for permanent employment. *** It's simply impossible to reconcile this claim with the specific language of the [employment agreement], or with [the language] on page five and six of the Letter Agreement [discussing the entitlements due Schultz and plaintiff upon their termination from PRS].
>
> \* \* \*
>
> That [the letter agreement] is a preliminary instrument or a mere recital of understanding is made clear *** when the parties agree therein that upon the quote, 'determination of all aspects of such agreement to the mutual satisfaction,' end quote, specific agreements then will be made and executed and bylaws amended.
>
> Clearly, it is contemplated that yet to be drafted agreements will constitute *** the embodiment of their agreement. Nowhere in the letter agreement is there any provision for permanent employment or termination of [plaintiff] for cause only. Nor are such provisions found in the employment agreement ***.
>
> \* \* \*
>
> *** [The] broad generalities [contained in the letter agreement] do not serve to amend, modify or invalidate any of the specific terms later expressly set out.
>
> \* \* \*
>
> A better argument can be made that the letter agreement has been superseded by the specific terms of the August 1 employment agreement. The argument is supported by the reality that when general language, broad and sweeping language is later refined into specific, precise and exact language, it's the latter that controls the undertaking.
>
> \* \* \*
>
> Since the inferred intent said to arise out of the letter agreement

is expressly refuted by the express intent of the employment agreement, it is the latter which as a matter of law *** controls these parties.

\* \* \*

Plaintiff's contention that the spirit and intent of the total understanding or total agreement, that he not be terminated except for cause is nowhere supported by any of the writings. Indeed, such a provision would change the dynamics of the agreement from mutual and identical termination rights, to at will for the employee, but for cause for the employer.

As I stated, nothing in the agreement supports such a notion."

In addition to affirming plaintiff's termination, the trial court also affirmed the validity and enforceability of the noncompetition agreement, concluding that both the time and geographical restraints were in conformity with Illinois law.

After granting summary judgment for PRS on counts I and II of its counterclaim, the trial court turned its attention to the consequences of this ruling on the four counts of plaintiff's complaint. The court determined that count I of the complaint, which sought to enjoin plaintiff's termination, necessarily failed upon its finding that the termination was lawful and proper. The court further determined that, in light of the fact that PRS and/or Schultz had an obligation under the stock purchase and repurchase agreement to repurchase plaintiff's stock upon his termination, plaintiff lacked standing to pursue counts II and III of his complaint, which sought corporate dissolution and the appointment of a receiver. Plaintiff's motion to vacate the dismissal of count I was subsequently denied.

The case then proceeded to trial on count IV of plaintiff's complaint alleging breaches of fiduciary duty by Schultz in relation to PRS and in relation to plaintiff as a minority shareholder, and on counts III and IV of PRS's counterclaim alleging breaches of contract and fiduciary duty by plaintiff. At the close of plaintiff's case, the trial court directed a verdict in favor of Schultz on count IV of plaintiff's complaint, finding that Schultz did not breach his fiduciary duty by wrongfully terminating PRS's primary revenue producer, namely, plaintiff, to the company's detriment. Plaintiff has not appealed from this ruling.

Debra Ann Kowalczyk testified for plaintiff that she was formerly a transcriptionist at PRS. Kowalczyk was aware that Schultz had become concerned that his patients were being misreferred to plaintiff within the company. Kowalczyk knew plaintiff maintained a separate medical practice in Lake Forest because she received telephone calls at PRS from his Lake Forest answering service.

Janis Hasenmiller testified for plaintiff that she became PRS's office manager in November 1991 after Susan Kohnke was fired. When she interviewed for the position, Schultz informed her that Kohnke had been fired because plaintiff's patients from another office were being "filtered" through the PRS office with neither medical records nor payment received by PRS.

Hasenmiller was aware that plaintiff had established a separate Lake Forest practice, as was Schultz, who told Hasenmiller to document calls received at PRS regarding the Lake Forest practice, and to send a copy of the documentation to PRS's attorneys. Schultz instructed Hasenmiller that patients calling to see Schultz should under no circumstances be allowed to see plaintiff.

Hasenmiller further testified that plaintiff stopped having surgical procedures coded for insurance purposes by PRS's staff. Consequently, Schultz became concerned that insurance company payments would be directed to plaintiff and would not be properly filtered to PRS. Schultz asked Hasenmiller to review lists of plaintiff's patients to determine if PRS had medical or financial records for these patients. These lists included patients treated by plaintiff at Lake Forest Hospital, Golf Surgical Center, Holy Family Hospital, and Northwest Community Hospital. For the majority of these patients, no records were found at PRS.

Kohnke testified as an adverse witness for PRS. In addition to being PRS's office manager until October 1991, Kohnke also provided services for plaintiff's Lake Forest practice, including scheduling appointments and billing for services performed. Kohnke stated that Schultz had known of the existence of the Lake Forest office because on two occasions, he referred a patient there for a second opinion.

Kohnke was aware that plaintiff saw his Lake Forest patients at PRS's office on an "as needed basis," based on what was convenient for himself or the patient. Plaintiff and Kohnke decided that medical records would not be retained at the PRS office for the Lake Forest patients. Kohnke acknowledged that payments received from these patients were not passed through PRS.

Kohnke testified that she scheduled procedures for plaintiff's Lake Forest patients at Golf Surgical Center, as well as Holy Family, Northwest Community and Lutheran General Hospitals. Kohnke acknowledged that these were all facilities where plaintiff and Schultz treated PRS patients. Kohnke never told Schultz that plaintiff was treating Lake Forest patients at these facilities.

Plaintiff testified that he opened his Lake Forest office in part because he wanted to reach an entirely different geographic area. Plaintiff did not discuss with Schultz that any of his Lake Forest

patients would be treated anywhere besides Lake Forest Hospital or his Lake Forest office. He treated at least one Lake Forest patient at Lutheran General, and he testified that most of his Lake Forest practice came from patients seen in the emergency room at Northwest Community Hospital. Plaintiff decided if a patient seen in the emergency room would become a PRS or Lake Forest patient based on where the patient wanted follow-up care performed. Plaintiff saw 20 to 25 Lake Forest patients at PRS's office.

At the close of the evidence, the trial court ruled that Schultz and PRS, by Schultz, had actual knowledge both of the existence of plaintiff's Lake Forest practice and of the fact that the revenues generated from the practice were not being run through PRS. The court also concluded that any gain realized by plaintiff from his Lake Forest practice was *de minimis.* Accordingly, the court entered judgment for plaintiff on PRS's claims of breach of contract and breach of fiduciary duty. The court made no finding concerning plaintiff's treatment of Lake Forest patients at PRS's office or his diversion of patients from health care facilities near PRS to his Lake Forest practice.

■ We first address plaintiff's preliminary contention that the trial court erred in allowing PRS to present its summary judgment motion one week before trial and in conducting a hearing on the motion on the first day of trial. Plaintiff argues that the motion should have been barred for being untimely filed. We reject what we consider to be an argument without merit.

It is clear from the record that plaintiff knew PRS intended to file a summary judgment motion after PRS had finished taking his deposition in January 1993. The record indicates that when, on December 18, 1992, plaintiff motioned the court to set a trial date, PRS advised the court and plaintiff that it contemplated filing a summary judgment motion after plaintiff's deposition had been completed. Plaintiff responded that there would still be triable issues remaining, and notwithstanding his knowledge of PRS's intent to file the motion, requested a March 1993 trial date. The record further indicates that PRS filed its summary judgment motion on February 16, 1993, over a month before the trial was to begin, and sought to present the motion on February 26, 1993. However, since the trial judge assigned to the case was not sitting on that date, an *agreed* order was entered continuing the motion to March 8, 1993. The matter was then continued to the first day of trial.

The foregoing facts belie plaintiff's claim that PRS's summary judgment motion came as a last-minute surprise to him. In addition to plaintiff's being forewarned in December that a summary judgment

motion was forthcoming, plaintiff had well over a month to prepare for the motion once it was filed and therefore had adequate time in which to anticipate the consequences he would face in the event the motion was granted. We find no error in the trial court's decision to consider the motion on the morning of trial.

Plaintiff next contends that the trial court erred in granting summary judgment in PRS's favor on count I of its counterclaim. He maintains that the trial court improperly followed the termination provisions contained in the employment agreement rather than following the "spirit and intent" language of the earlier letter agreement.

■ Summary judgment is proper where the pleadings, depositions, and admissions on file, together with any affidavits, show there is no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. (*State Farm Mutual Automobile Insurance Co. v. Collins* (1994), 258 Ill. App. 3d 1, 629 N.E.2d 762.) Where the facts of a case are undisputed, as in the present case, the interpretation of a contract is purely a question of law that may be decided on summary judgment by the trial court and independently reviewed by the appellate court. (*State Farm*, 258 Ill. App. 3d at 3, 629 N.E.2d at 763.) The parties agree that the issues which plaintiff presents here are questions of law and are thus subject to this court's *de novo* review.

Under the general rules of contract construction, "[t]he determinative factor is the intention of the parties, which can best be determined by considering the contract as a whole, reviewing each part in light of the others." (*Wilson v. Wilson* (1991), 217 Ill. App. 3d 844, 850, 577 N.E.2d 1323, 1327.) Plaintiff argues that the letter agreement must be deemed to be a part of the parties' employment agreement, despite the fact that it was executed apart from and prior to the employment, stock purchase and repurchase, and noncompetition agreements. He further argues that only the letter agreement contains a clear expression of the parties' intention regarding their employment arrangement, pointing to the provisions which state that "[t]he parties intend such association to result in the orderly transfer of ownership of the corporation and medical practice of Schultz" upon Schultz's retirement, and that "all corporate actions shall be consistent with the spirit and intent of this association agreement."

The trial court found, however, that these statements were "mere recitals of understanding" which did not serve to amend, modify or invalidate any of the specific terms set out in the subsequent agreements. While we recognize that under the *de novo* standard of

review, we need not defer to the trial court's findings, we nevertheless conclude that its analysis is in conformity with Illinois law.

■ It is well settled that when a contract contains both general and specific provisions relating to the same subject, the specific provision controls. (*Wilson*, 217 Ill. App. 3d at 851, 577 N.E.2d at 1328.) Thus, even assuming plaintiff is correct that the employment agreement is comprised, in part, of the letter agreement, the language contained in the subsequent employment agreement controls. The employment agreement contains a specific provision permitting plaintiff's termination by the approval of 60% of the holders of the outstanding shares of PRS stock. Clearly, this specific provision prevails over the general statements describing the parties' goals and aspirations found in the letter agreement. Were we to adopt plaintiff's argument that the letter agreement provisions control, we would have to disregard the employment agreement provision allowing PRS to terminate plaintiff, as well as that section of the letter agreement outlining the entitlements due plaintiff and Schultz in the event either terminated his employment with PRS. This result would contradict the well-settled rules of contract construction that all provisions are presumed to have been inserted for a purpose and that a contract should be interpreted to give meaning and effect to each provision contained therein. *Mayfair Construction Co. v. Waveland Associates Phase I Ltd. Partnership* (1993), 249 Ill. App. 3d 188, 619 N.E.2d 144.

Moreover, the letter agreement expressly contemplates the execution of subsequent agreements embodying the essentials of the parties' employment arrangement. These agreements address the precise topics discussed in the letter agreement but in greater detail. Under Illinois law, "[a] complete, valid, written contract merges and supersedes all prior and contemporaneous negotiations and agreements dealing with the same subject matter." (*Courtois v. Millard* (1988), 174 Ill. App. 3d 716, 720, 529 N.E.2d 77, 79; see also *Magnus v. Lutheran General Health Care System* (1992), 235 Ill. App. 3d 173, 601 N.E.2d 907.) In this case, then, the employment agreement can be said to have superseded the letter agreement such that the termination provision contained in the employment agreement remains in force.

In upholding the validity of this provision, we find it significant that plaintiff himself had an unconditional right under the employment agreement to terminate his employment arrangement with PRS. In our view, this undercuts plaintiff's claim that the parties intended him to be a *permanent* employee of PRS. Undoubtedly, if this were the case, such a provision allowing him to leave PRS at his whim would not have been included in the employment agreement.

For the reasons stated above, we hold that the trial court properly granted summary judgment for PRS on count I of its counterclaim. Plaintiff's termination from PRS was an event that was clearly permitted by the employment agreement.

■ Plaintiff next contends that the trial court erred in dismissing counts I, II, and III of his complaint after granting PRS's motion for summary judgment on count I of its counterclaim. In dismissing the counts, the trial court reasoned:

> "Having declared the termination valid, the contention of plaintiff[ ] that the termination is invalid is clearly rejected, and count one of the complaint must fail and did fail. *** It was the necessary product of the granting of summary judgment as to count one of the counterclaim. It is just the opposite side of the same coin.
>
> So when I grant count one's summary judgment on the counter-claim, I must put force and logic and reject count one of the complaint and that is what I did, so the motion to vacate is denied."

We agree with the trial court's reasoning. A logical consequence of a ruling upholding the validity of plaintiff's termination would indeed be the dismissal of plaintiff's complaint alleging his termination was improper. Furthermore, once the termination has been determined to be proper, the provisions of the stock purchase and repurchase agreement, obligating PRS and/or Schultz to repurchase the shares of PRS stock held by plaintiff, come into play. Because Schultz agreed to buy back the PRS stock, plaintiff no longer had standing to petition the court to dissolve the company or to appoint a receiver. Accordingly, the trial court's dismissal of counts II and III of plaintiff's complaint was also proper.

Next, plaintiff contends that the trial court erred in granting PRS's motion for summary judgment on count II of its counterclaim, which sought a declaration that the noncompetition agreement was valid and enforceable. Plaintiff raises three arguments in connection with this contention: (1) that this issue was not ripe for the trial court's review; (2) that the noncompetition agreement should not be enforced because PRS acted in bad faith; and (3) that the court erred in striking certain testimony which would have supported a claim of bad faith.

Plaintiff argues initially that the court could not properly consider the enforceability of the noncompetition agreement because no "actual controversy" yet existed.

■ Section 2—701 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 2—701) permits courts to make binding declarations "in cases of actual controversy." An "actual controversy" exists where

"there is a legitimate dispute admitting of an immediate and definite determination of the parties' rights, the resolution of which would help terminate all or part of the dispute. [Citation.] The requirement that an actual controversy be present does not mean that a party must have been wronged and suffered an injury [citation], nor that a party must allege the existence of the possibility of imminent harm. [Citation.] Rather, an actual controversy may be found 'where the mere existence of a claim, assertion or challenge to [a party's] legal interests portends the ripening seeds of litigation.' [Citation.] ***

The remedy of declaratory judgment in Illinois is designed to settle and fix rights before there has been an irrevocable change of position of the parties in disregard of their respective claims of right. [Citation.] The procedure is used to afford security and relief against uncertainty with a view to avoiding litigation, rather than in aid of it." *City of Chicago v. Department of Human Rights* (1986), 141 Ill. App. 3d 165, 169-70, 490 N.E.2d 53, 57.

■ Here, the trial court found an actual controversy based on the fact that plaintiff regularly performed procedures at Lutheran General Hospital, a location which plaintiff was expressly prohibited from servicing under the noncompetition agreement. In our view, it was within the trial court's discretion to reasonably anticipate that plaintiff might, in the near term, raise an issue as to the validity of the agreement, particularly since it precluded him from doing business in a facility from which a significant portion of his client base was derived, and to choose, therefore, to resolve the issue before PRS had been wronged.

■ Plaintiff also contends that he was terminated in bad faith, and as such, the noncompetition agreement is unenforceable. Plaintiff maintains that Schultz terminated him as "a measure of revenge" after he refused "to facilitate a scheme hatched by Schultz to avoid substantial personal tax liability," and only after Schultz had received the final installment of his $250,000 senior consulting fee. The "scheme" to which defendant refers involved the addition of Schultz's son, Richard, Jr., to the staff of PRS to assist Schultz in resolving the problem of an overfunded pension plan.

We do not believe the record supports the above contention. We note initially that plaintiff's termination occurred a year after Schultz received the last installment of the consulting fee, negating plaintiff's apparent claim that Schultz terminated him immediately upon receiving the remainder of the fee. The record further indicates that Schultz made the decision to terminate plaintiff only after learning that he had treated several of his Lake Forest patients at PRS's office, without maintaining medical records there or passing

payments received from these patients on to PRS. Hasenmiller testified that when she interviewed with Schultz for the position of office manager in November 1991, Schultz told her that Kohnke, who was then also plaintiff's Lake Forest office manager, had been fired because plaintiff's patients from "another office" were being "filtered" through the PRS office with neither medical records nor payment received by PRS.

Additionally, as plaintiff himself acknowledged, his relationship with Schultz became extremely strained over the years. The two disagreed over nearly every aspect of the business, according to plaintiff, and, as the trial court noted, by 1988, Schultz began to suspect that the staff was misreferring patients to plaintiff within PRS, further adding to the strain. When, in 1991, Schultz discovered plaintiff was seeing his Lake Forest patients at PRS's office, Schultz exercised his right, as PRS's majority shareholder, to terminate him. Under these circumstances, we cannot conclude that plaintiff's termination was based on anything other than good cause. While plaintiff may, in fact, have disagreed with hiring Richard, Jr., onto the staff of PRS and while Schultz may not have been pleased with plaintiff's opposition to the idea, the fact remains that there was still sufficient cause, apart from the subject of hiring Richard, Jr., to support plaintiff's termination.

As a final challenge to the validity of the noncompetition agreement, plaintiff argues that the trial court erred in striking certain discovery deposition testimony given by Richard, Jr. Plaintiff maintains that Richard, Jr.'s testimony would have supported his claim that he was terminated in bad faith.

The testimony to which plaintiff refers merely highlights his opposition to Schultz's plan to appoint Richard, Jr., as a director of PRS. As discussed above, the fact that plaintiff and Schultz disagreed about this does not change the fact that plaintiff utilized PRS's office to see non-PRS patients without Schultz's authorization, and that once Schultz learned of this, he terminated plaintiff. Indeed, Richard, Jr.'s deposition testimony reflects Richard, Jr.'s own understanding that plaintiff was terminated because he was "seeing patients both in and out of the corporate offices without accounting for them through the corporation, either through medical records or financially." We reject plaintiff's claim that he was terminated in bad faith.

For the foregoing reasons, we agree with the trial court that the noncompetition agreement is valid and enforceable against plaintiff.

On its cross-appeal, PRS contends that plaintiff breached his fiduciary duty to PRS and breached the employment agreement by "diverting" clients to his Lake Forest practice from hospitals

traditionally serviced by PRS and by treating Lake Forest patients at PRS's office without Schultz's approval and without submitting the fees received from these patients to PRS. PRS does not contest the trial court's finding that Schultz had actual knowledge of plaintiff's Lake Forest practice and of the fact that the revenues and expenses generated by that practice were not being run through PRS. Nor does it contest the trial court's finding that plaintiff invited Schultz to share in the Lake Forest practice, but that Schultz declined the invitation.

■ With respect to the breach of contract claim, PRS cites to paragraph 3 of the employment agreement, which states:

"Doctor agrees:

* * *

(c) Not to engage in, or work for any individual, firm or corporation engaged in, the same or similar activities including but not limited to the practice of plastic, reconstructive, and otolaryngology medicine and surgery now or hereafter carried on by the Corporation during the term of this Agreement without the consent of the Board of Directors of the Corporation. Any fees derived from medical services rendered outside the Corporation will accrue to the Corporation unless prior approval is granted by the Board of Directors."

PRS argues that it cannot be said to have waived a breach of contract claim that is premised on the fact that plaintiff "diverted" patients from PRS's territory to his Lake Forest practice because it did not know until after plaintiff was terminated that he had, in fact, done so. We nevertheless believe that PRS has waived performance of the agreement.

Clearly, paragraph 3(c) was designed to preclude plaintiff from working in any capacity and *in any location* in the field of plastic and reconstructive surgery while still affiliated with PRS. The provision did not become operative only when plaintiff engaged in outside business *within* PRS's territory. The time to call into play the provision arose, as the trial court found, when Schultz learned that plaintiff had established the separate practice. He chose, however, not to do so. Accordingly, we can only conclude that PRS has waived its right to now seek performance of the provision.

■ As to the breach of fiduciary duty claim, we agree with PRS that plaintiff breached that duty by treating patients at hospital emergency rooms within PRS's market area and directing those patients to his Lake Forest practice instead of to PRS, and by seeing his Lake Forest patients at PRS's office, without Schultz's authorization. Plaintiff clearly had a duty not to compete with PRS for

patients, particularly in facilities traditionally serviced by PRS. His conduct of referring patients to his Lake Forest practice, that may well have become patients of PRS had the Lake Forest practice not existed, was improper.

We decline, however, to award the damages PRS requests, namely, the compensation it paid to plaintiff during the period of his breach and the imposition of a constructive trust on all revenues resulting from the breach, because we do not believe equity compels this outcome under the circumstances here.

In *In re Marriage of Pagano* (1992), 154 Ill. 2d 174, 607 N.E.2d 1242, our supreme court stated:

"[W]hen one breaches a fiduciary duty to a principal the appropriate remedy is within the equitable discretion of the court. While the breach may be so egregious as to require the forfeiture of compensation by the fiduciary as a matter of public policy (see, *e.g.*, *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1980), 90 Ill. App. 3d 817, 836, [413 N.E.2d 1299]), such will not always be the case. Punitive damages are *permissible* where a duty based on a relationship of trust is violated, the fraud is gross, or malice or willfulness are shown; such an award is not automatic. [Citations.]" (Emphasis in original.) 154 Ill. 2d at 190, 607 N.E.2d at 1250.

In this case, the trial court found that, in light of the nature of PRS's compensation scheme, any gain to plaintiff resulting from his diversion of potential PRS patients to his Lake Forest practice was *de minimis*. Under the employment agreement, plaintiff was entitled to receive every dollar of income which he brought into PRS, less his *pro rata* share of the company's overhead expenses. Plaintiff's *pro rata* share of these shared expenses was that percentage equal to the ratio between the income which flowed into PRS from services he provided and the total PRS income from services rendered by him and Schultz together. Accordingly, the only "gain" or "profit" which plaintiff could hope to obtain from misdirecting a patient from PRS to Lake Forest would be the marginal savings, if any, which resulted from his decreased *pro rata* share of PRS's shared overhead expenses. Plaintiff estimates in his brief that this "gain" amounted to at most $3,400 for the period in which he operated his Lake Forest practice while still employed at PRS. The trial court found that when the overhead expenses incurred as a result of these patients was factored in, Schultz would have actually lost money.

Moreover, plaintiff explained in his brief that many of the "diverted" patients about whom PRS now complains actually began as Lake Forest patients who were initially seen in his Lake Forest of-

fice or somewhere outside PRS's territory, and for reasons beyond his control had to be seen on another occasion at a location within PRS's territory. We believe the record supports this explanation and undercuts PRS's contention that plaintiff willfully and maliciously stole business from PRS whenever the opportunity arose.

We find it noteworthy that plaintiff was forthright with Schultz about the existence of his Lake Forest practice and even invited Schultz to share in the revenues and expenses of the practice, which Schultz declined to do. We find it equally noteworthy that PRS continued to compensate plaintiff even after learning of the separate practice. The record suggests that one reason Schultz did not challenge the practice was because he benefitted personally from its existence. For him, it became a convenient source for second opinions needed to treat various patients. In light of this obvious acquiescence on the part of Schultz, we would be hard put to order plaintiff to reimburse PRS for the compensation it paid to plaintiff while knowing of the separate practice all along.

Under the circumstances presented in this case, we believe that the damages which PRS seeks, amounting to over $1 million, are unwarranted and are therefore denied.

For the foregoing reasons, the judgment of the circuit court of Cook County both as to the direct appeal and cross-appeal is affirmed.

Judgment affirmed.

EGAN, P.J., and GIANNIS, J., concur.