**In re Julie R. PETERSEN, a/k/a Julie R. Boone, Debtor.**

**Urological Group, Ltd., Plaintiff,**

**v.**

**Julie R. Petersen, a/k/a Julie R. Boone, Defendant.**

**Bankruptcy No. 00–83695.**
**Adversary Nos. 01–8021, 01–8022**

United States Bankruptcy Court, C.D. Illinois.

July 18, 2003.

Dale G. Haake, Jeffrey C. McDaniel, Rock Island, IL, for creditor.

Robert T. Park, Rock Island, IL, for debtor.

### *OPINION*

THOMAS L. PERKINS, Bankruptcy Judge.

This matter having come before the Court for trial on complaints brought by the Urological Group, Ltd. ("GROUP"), the former employer of the Debtor, Julie R. Petersen ("DEBTOR"), against her, seeking to deny her discharge and a determination that the debt owing is nondischargeable. The trial spanned four days and the Court heard testimony from fif-

teen witnesses. Also taken with the adversary complaints is the DEBTOR'S objection to the proof of claim filed by the GROUP in the main case proceeding.

The DEBTOR was employed by the GROUP for nineteen years. David Petersen, the DEBTOR'S present husband, joined the GROUP as a physician in 1977. The DEBTOR began working for the GROUP in 1979, as a clerk and to assist with patients. In 1984, Dr. Petersen became president of the GROUP. Dr. Lubbers joined the GROUP in 1990. In the early 1990's, the DEBTOR was promoted to office manager. Prior to her promotion, she and Dr. Petersen became involved in a personal relationship. At that time, the GROUP was comprised of Dr. Petersen, Dr. Lubbers, Dr. Landrey, and Dr. Weimer. Dr. Weimer died in March, 1995, and Dr. Landrey left the GROUP in September of 1995. Dr. Prusa joined the GROUP in January, 1996 and Dr. Engebrecht joined six months later in July, 1996. With the addition of the new physicians, the GROUP had a very profitable year in 1996.

By then, the DEBTOR had become a highly valued and trusted employee. The DEBTOR'S responsibilities as office manager were extensive. She supervised the office employees and was responsible for obtaining replacements when employees left, conducting initial interviews of applicants. She was responsible for the computer system of the office, consisting of the mainframe and fifteen computers, as well as the other equipment including the phones and fax machines. She was in charge of credentialing all the physicians with state agencies, insurance companies and the hospitals. She also purchased all of the supplies for the office, including the supplies needed for the nurses, in addition to purchasing the supplies for the kitchen. The DEBTOR prepared and submitted the financial information to the outside accountant. She prepared the accounts payable, the payroll and made the requisite withholding tax deposits. In her role as office manager, the DEBTOR handled any problems that the office staff encountered.

In addition to those duties, the DEBTOR'S primary responsibility, from the GROUP'S perspective, was billing of hospital services, as well as complicated office billings. In order to receive payment from insurance companies, HMOs or other provider groups, and Medicare, physicians were required to designate "codes" for the medical services and procedures performed. The code identified determined the level of payment the physician was entitled to. The DEBTOR was responsible for properly coding the physicians' hospital services, and she was the only employee of the GROUP with the expertise necessary to perform this time-consuming task.

As office manager, the DEBTOR was given a GROUP charge card. According to the DEBTOR, she was advised by Dr. Weimer that the charge card could be used for personal purposes, as long as the charges incurred were paid back. Due to her increased responsibilities and workload, the DEBTOR could no longer complete her work during the day. In 1993 or 1994, Dr. Petersen authorized the DEBTOR to work from her home. The DEBTOR began working overtime. The GROUP authorized the DEBTOR to have a telephone installed for her computer to enable her to work at home, and agreed to pay the charges. The DEBTOR kept track of her own time records, jotting down the number of overtime hours she worked on a desk calendar. The GROUP'S payroll records reflect that the DEBTOR received substantial overtime pay, steadily increasing the number of hours she worked.

In 1997, the DEBTOR'S life began to unravel. Work-related pressures intensified when the GROUP terminated its receptionist in December, 1996, and its medical transcriber quit soon thereafter. The DEBTOR, having suffered from back pain for some time, had obtained Vicadin, a prescription analgesic, from Dr. Weimer, prior to his death in 1995, from his office supply. The DEBTOR had quickly become dependent upon the painkillers. After Dr. Weimer's death, the DEBTOR continued to obtain the narcotics without a prescription. When Dr. Petersen became aware of the DEBTOR'S illegal drug use in September, 1997, she began seeing a psychiatrist. A significant backlog developed in the hospital billings, and due to the decreased revenue, the GROUP'S physicians did not receive a bonus after the end of the first quarter. Dr. Lubbers began to pressure the DEBTOR to catch up on the billings.

The DEBTOR and her first husband, Daniel Boone, were divorced in December, 1997. Under the terms of their agreement, the DEBTOR was awarded the marital residence and was responsible for the mortgage and other expenses, holding her former husband harmless. The DEBTOR became obligated to make a lump sum payment of $30,000.00 to Mr. Boone within thirty days. Among the marital debts allocated to the DEBTOR were debts owed to Bank One, Choice Visa, Shell MasterCard, Mail Handlers MasterCard, JC Penney, Capital One, Leath Furniture, and Heilig–Meyers. The debts allocated to Mr. Boone included debts owed to Fleet Visa, Prime Option Visa, Sable's Jewelry Store, Amoco, Sears, Payless Cashways, Dr. Rhonda VanSpeybroeck, and GTE Mobile Phone. Each party agreed to indemnify the other.

The other physicians in the GROUP had been unaware of the relationship between Dr. Petersen and the DEBTOR until it was disclosed in late October, 1997. Due to their concern that the relationship might have an adverse effect upon other employees in the GROUP, Dr. Lubbers was named manager of personnel for the office in November, 1997.

On March 1, 1998, the GROUP hired Laura Bettenhausen, an accountant, on a part-time basis, to perform some of the accounting functions in order to permit the DEBTOR to devote more of her time to the billing work. Around that time, the police began an investigation and the DEBTOR was later arrested and charged with unlawful acquisition of controlled substances. After the GROUP agreed upon the conditions of the DEBTOR'S continued employment, Dr. Engebrecht met with and advised the DEBTOR that her responsibilities were being curtailed and her supervisory role was being eliminated. After returning to work for one day, the DEBTOR was placed on medical leave by her personal physician and she resigned her position in July, 1998.

When the DEBTOR sold her home in February, 1999, Dr. Petersen covered the shortfall between the sales proceeds and the first and second mortgages, issuing a check on February 17, 1999 to McGehee and Boling in the amount of $4,168.19, and a check to Bank One in the amount of $22,793.99. He also attempted to ease her financial woes by purchasing her garden tractor, appliances and personal effects on December 29, 1998, for $8,000.00. The DEBTOR executed a bill of sale listing the property as a John Deere garden tractor, with mower, snow blower and accessories. The DEBTOR also submitted a bill of sale dated February 17, 1999, evidencing Dr. Petersen's purchase of "furniture including bedroom set, living room sofa & chair & tables; Family room sofas and tables, curio cabinet, Dining Room table & chairs, clock, refrigerator, Precious Moments,

framed prints and accessories and personal items," for $26,962.18. Though not specifically itemized, the DEBTOR testified that the property sold to Dr. Petersen included the following items of jewelry: a gold chain and earrings purchased for $2,518.75; a gold necklace and diamond slide for over $1,000; a gold necklace for $612.25 and a diamond pendant for $1,013.60.

After the DEBTOR left the GROUP, rumors regarding her personal use of the GROUP'S credit card triggered an investigation. That investigation disclosed the DEBTOR'S personal use of the card, though the GROUP was not able to ascertain which purchases were for business purposes. Conflict escalated between Dr. Petersen and the other physicians and Dr. Petersen was voted out of office in March, 1999. He left the GROUP in June, 1999, to set up a practice of his own. Dr. Petersen and the DEBTOR were married in August, 1999. He sued the GROUP in state court, alleging claims for breach of employment agreement, conversion, breach of buy and sell agreement, injunction and accounting. The GROUP has asserted counterclaims against him, including breach of fiduciary duty, misappropriation of funds, civil conspiracy and accounting. In January, 2000, the GROUP sued the DEBTOR in state court, alleging civil conspiracy, breach of fiduciary duty, breach of the duty of loyalty, and misappropriation of funds.

Daniel Boone, the DEBTOR'S former spouse, filed a Chapter 7 bankruptcy on August 17, 2000, receiving a discharge in November, 2000. That filing precipitated the filing of a Chapter 7 petition by the DEBTOR on November 13, 2000. The DEBTOR listed the GROUP on her schedule of unsecured creditors as holding a claim in the amount of $100,000.00, arising from a "disputed lawsuit." She did not,

however, disclose the pending lawsuit in the Statement of Affairs. The DEBTOR listed a checking account at IH Mississippi Valley Credit Union as having a balance of $25.00. The DEBTOR reported that she owned no household goods and furnishings and listed clothes valued at $200.00. The GROUP filed a proof of claim, Claim # 8, as unsecured, in the amount of $150,000.00, attaching a copy of the complaint it filed in the state court action against the DEBTOR. The DEBTOR objected to the claim.

The GROUP filed a complaint in Adv. No. 01–8022 against the DEBTOR, seeking a determination that the DEBTOR is indebted to the GROUP for her use of the GROUP'S charge card, unauthorized pay raises, unearned overtime pay and losses suffered by failing to timely bill insurance and third party providers for procedures performed by the GROUP and that such debts are nondischargeable under Sections 523(a)(2), (a)(4) and (a)(6) of the Bankruptcy Code. The GROUP also filed a complaint in Adv. No. 01–8021 against the DEBTOR, seeking denial of the DEBTOR'S discharge under Sections 727(a)(2), (a)(3), (a)(4) and (a)(5). The adversary proceedings were consolidated for purposes of trial by stipulation of the parties, and the DEBTOR'S objection to the claim filed by the GROUP is to be decided along with the adversary proceedings. Briefs were neither requested nor submitted after trial.

## DISCHARGEABILITY OF THE DEBT

An action to determine the dischargeability of a debt under Section 523(a) has two components. *In re Trovato*, 145 B.R. 575 (Bankr.N.D.Ill.1991) (citing *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)). As the first step, the creditor must establish a debt owed by the debtor. Section 101(2) of the Bankruptcy Code defines "debt" as a liability on a claim and Section 101(5)

defines "claim" as a right to payment. The term "claim" has been interpreted very broadly, to include all legal obligations of the debtor. *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990). Whether the creditor holds an enforceable obligation is determined by relevant, substantive nonbankruptcy law. *Butner v. U.S.*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

■■■ Once the creditor establishes a valid claim under nonbankruptcy law, the bankruptcy court turns to the provisions of Section 523(a) to determine the issue of nondischargeability. A creditor seeking to establish an exception to the discharge of a debt bears the burden of proof. *Matter of Scarlata*, 979 F.2d 521 (7th Cir.1992). A creditor must meet this burden by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). In order to afford the debtor a "fresh start," exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor. *Meyer v. Rigdon*, 36 F.3d 1375 (7th Cir.1994).

## 1. Existence of the debt.

The GROUP contends that the DEBTOR owes it in excess of $200,000.00. The GROUP breaks down this sum into three components. First, the GROUP contends that the DEBTOR used its credit card to make personal purchases totaling approximately $38,000.00. The DEBTOR acknowledges a debt to the GROUP for personal charges, but disputes the amount claimed by the GROUP. In this category, the GROUP seeks to recover the sum of $3,802.54, representing purchases made by the DEBTOR at Jewel Food Store, in excess of the GROUP'S estimate of rea-

sonable amount and charges made for certain "900 number" calls on the DEBTOR'S work phone line installed at her home. The GROUP also seeks to recover overdraft charges assessed against the GROUP'S account at Blackhawk State Bank in the amount of $525.00. Because the DEBTOR admits being indebted to the GROUP for some charges made on the GROUP'S credit card, the extent of her liability will be addressed in the next section dealing with the dischargeability of that debt.

Second, the GROUP contends that the DEBTOR received excessive pay during the latter years of her employment by giving herself unauthorized and excessive pay raises and unwarranted and excessive overtime. Third, the GROUP alleges that the DEBTOR knowingly failed to bill various insurance providers which resulted in a loss to the GROUP of over $100,000.00. The DEBTOR disputes any liability under either the second or the third category.

■■ Breaking down its claim for excessive pay and unwarranted overtime, the GROUP claims that the DEBTOR received a salary overpayment in the amount of $7,679.49;[1] overtime pay while on vacation in the amount of $3,141.57; and unauthorized and unwarranted overtime in the amount of $80,707.32. According to the GROUP'S records, the DEBTOR regularly worked overtime throughout the calendar year 1996, increasing from twenty hours per pay period at the beginning of the year to thirty hours per pay period at the end of the year. The DEBTOR'S salary during 1996 was $56,287.50 and the amount of her overtime wages were $14,120.82. In addition, the DEBTOR received four bonuses totaling $5,800.00, making her gross

---

1. This figure is taken from Count II of the Complaint filed in Adv. No. 01–8022. At trial, however, the GROUP failed to quantify a salary overpayment. *See* n. 2, *supra.*

income for 1996 the sum of $76,208.32.[2]

Commencing in 1997, the DEBTOR steadily increased her overtime hours, for each semimonthly pay period, as follows:

| Date | Overtime Hours | Date | Overtime Hours | Date | Overtime Hours |
|------|------|------|------|------|------|
| 01/15 | 35.0 | 05/15 | 52.0 | 09/15 | 67.0 |
| 01/31 | 35.0 | 05/31 | 55.0 | 09/30 | 67.0 |
| 02/15 | 36.5 | 06/15 | 57.0 | 10/15 | 67.0 |
| 02/28 | 36.5 | 06/30 | 57.0 | 10/31 | 67.0 |
| 03/15 | 36.5 | 07/15 | 57.0 | 11/15 | 70.0 |
| 03/31 | 41.0 | 07/31 | 65.0 | 11/30 | 65.0 |
| 04/15 | 50.0 | 08/15 | 65.0 | 12/15 | 65.0 |
| 04/30 | 52.0 | 08/31 | 65.0 | 12/31 | 65.0 |

The DEBTOR received $61,120.50 in salary and $40,116.50 in overtime wages. She received only one bonus during 1997 in the amount of $2,500.00, bringing her total compensation received in 1997 to $103,737.00.

The DEBTOR'S pattern of steadily increasing her overtime hours continued throughout the first half of 1998:

| Date | Overtime Hours | Date | Overtime Hours |
|------|------|------|------|
| 01/15 | 70.0 | 03/31 | 74.0 |
| 01/31 | 70.0 | 04/15 | 74.0 |
| 02/15 | 72.0 | 04/30 | 74.0 |
| 02/28 | 72.0 | 05/15 | 75.0 |
| 03/15 | 72.0 | 05/31 | 75.0 |

The DEBTOR received salary of $29,100.50 and overtime wages of $26,470, totaling $55,570.50.

The GROUP contends that all of the overtime paid to the DEBTOR during 1996, 1997 and 1998, totaling $80,707.32, was unearned and improper. In addition,

the GROUP maintains that the payment to the DEBTOR of overtime wages in the amount of $825.00 on December 15, 1996, and in the amount of $2,350.50 on October 15, 1997, when she was on vacation was improper. At trial, the GROUP attempted to portray the DEBTOR as impaired by addiction to painkillers,[3] out shopping instead of working.

The DEBTOR testified that she was required to work more than forty hours per week in order to keep the GROUP operating. She maintains that she typically worked four days per week until 6:30 or 7:30 in the evening. After spending an hour or so with her children, she would work at home from 8:30 or 9:00 until 1:00 or 2:00 in the morning. The DEBTOR had one day off during the week, in exchange for working Saturday morning. She testified that she would often work the rest of the weekend at home as well. The DEBTOR'S testimony that she, at the GROUP'S request, canceled a family vacation to remain at work in order to catch up, was unrefuted. Dr. Petersen testified that she was authorized to be paid vacation reimbursement.

Dr. Petersen testified that the DEBTOR kept office hours from 9:00 a.m. to 7:00 p.m. In addition, when he was working late at the office he would often observe that her work computer was being accessed from a remote location, which he assumed

2. The GROUP pointed out that the DEBTOR'S hourly rate did not remain constant, but fluctuated both up and down. The DEBTOR had no explanation for this, insisting that her pay rate was dictated by the GROUP'S accountant, Robert Wolf. No testimony or documentation was offered by the GROUP as to the DEBTOR's correct hourly rate.

3. Both the GROUP and the DEBTOR walk a fine line regarding the DEBTOR'S use of narcotics. Although the GROUP paints the DEBTOR as addicted to drugs during much of the relevant time period, the GROUP

claims that the DEBTOR was not so impaired that she could not possess the requisite intent with regard to her conduct for nondischargeability purposes. The DEBTOR, while admitting a drug problem, denies being addicted and makes no claim of being unable to perform her job duties on account of her drug use. Although each party used physician witnesses, neither side offered any expert testimony whatsoever as to the likely effect on the DEBTOR of her drug use, as to her memory, her ability to perform her job, her state of mind, or otherwise.

was the DEBTOR working from home. The DEBTOR'S mother corroborated her testimony. She testified that she practically lived at the DEBTOR'S house, performing her domestic chores and taking care of the DEBTOR'S children, necessitated because the DEBTOR put her job before her family.

Dr. Lubbers testified that in the late summer and fall of 1997, the DEBTOR took extended lunch hours. From December of that year, through March, 1998, he characterized the DEBTOR'S appearance as "rather spotty." According to Dr. Lubbers, some days the DEBTOR would only be at the office an hour or two a day, and other days she would not appear at all. His testimony, however, was not corroborated by the GROUP'S own witnesses. According to the testimony of Margaret Rose Adams, a billing clerk who worked under the supervision of the DEBTOR, the DEBTOR maintained her regular daytime office hours, in addition to working late on many days, through April, 1998, but was in the office "very rarely" during the months of May and June. Brenda Dryoel, a nursing supervisor who also testified on behalf of the GROUP, corroborated this testimony, limiting the DEBTOR'S absence from work to the period of several weeks before she resigned.

 An employer may not ordinarily recover compensation voluntarily paid to an employee absent fraud or a breach of the duty of loyalty. C.J.S. *Employee* § 179. Absent an agreement permitting the employer to recover on that basis, mere negligence on the employee's part in performance of his duties creates no obligation of repayment. *Nutrition Foundation, Inc. v. Gitzen,* 62 A.D.2d 943, 403 N.Y.S.2d 748 (N.Y.A.D. 1 Dept.1978). However, damages caused when an employee breaches the duty of loyalty to his employer may be recovered by the employer. Under Illinois law, employees who breach their fiduciary duties are required to forfeit all compensation received during the period of breach. *Archer Daniels Midland Co. v. Whitacre,* 60 F.Supp.2d 819 (C.D.Ill.1999). Though the duty of loyalty is not precisely defined, an employee has a duty to act with standard care and with the skill which is common for the kind of work which the employee is hired to perform. *Securities Investor Protection v. R.D. Kushnir & Co.,* 267 B.R. 819 (Bankr.N.D.Ill.2001).

Employees are held to have breached their fiduciary duties by competing with their employer, *Dolezal v. Plastic and Reconstructive Surgery, S.C.,* 266 Ill.App.3d 1070, 640 N.E.2d 1359, 204 Ill.Dec. 10 (Ill. App. 1 Dist.1994), *appeal denied,* 159 Ill.2d 565, 647 N.E.2d 1008, 207 Ill.Dec. 515, by diverting business opportunities, *Mullaney, Wells & Co. v. Savage,* 78 Ill.2d 534, 402 N.E.2d 574, 37 Ill.Dec. 572 (Ill.1980), and by soliciting customers away from their employer, *Jostens, Inc. v. Kauffman,* 842 F.Supp. 352 (C.D.Ill.1994). A bank employee's embezzlement of $940,000.00 over a twelve-year period has been held to be a breach of the employee's fiduciary duties owed to the bank. *LaSalle Bank Lake View v. Seguban,* 937 F.Supp. 1309 (N.D.Ill.1996).

It is clear here that the DEBTOR did not seek to mislead the GROUP as to the amount of compensation she was taking at any particular time. The conclusion that the GROUP encouraged the DEBTOR to work additional overtime hours in order to get the billing caught up is inescapable. The GROUP had no specific procedures to be followed in order to receive compensation for overtime work. The DEBTOR testified that she regularly recorded the amount of overtime she worked on her desk calendar. The DEBTOR'S semimonthly pay checks, signed by either Dr.

Petersen or Dr. Lubbers, set forth the amount of overtime hours the DEBTOR claimed to have worked. Though the GROUP delegated to her the responsibility of recording her own hours, it was not absolved of its responsibility to exercise control over the DEBTOR to determine whether she was actually performing the work which she reported to have performed. Having signed those pay checks over the course of a two and one-half year period without question, the GROUP cannot place a nearly impossible hurdle before the DEBTOR, by requiring her to prove the extent and amount of the work she performed from 1996 through June, 1998.

Moreover, the GROUP has failed to establish a basis for the Court to find that even a portion of the overtime was false, exaggerated or otherwise unjustified. The GROUP merely alleges that all of the overtime pay received by the DEBTOR was improper, apparently content to rely upon the inference that because the billings got farther and farther behind, the overtime pay was therefore not earned. In this Court's view, that inference is purely speculative and not supported by the evidentiary record.

■ With respect to the GROUP'S claim that the DEBTOR's job performance was deficient, the most that can be said is that the evidence is conflicting. Even assuming that it was demonstrated here, poor job performance is not tantamount to a breach of a duty of loyalty to the GROUP. *See, Boock v. Napier,* 3 Ill. App.2d 19, 120 N.E.2d 244 (Ill.App. 1 Dist. 1954) (disloyalty necessary to support forfeiture of compensation must amount to radical unfaithfulness or gross misconduct). The GROUP was pressuring the DEBTOR to get the billing out, giving her carte blanche to work overtime hours. Dr. Petersen, the President and principal executive officer of the GROUP, testified that

the DEBTOR worked long hours for the GROUP in the evenings. Dr. Lubbers admitted the DEBTOR'S contribution to the GROUP'S successful practice, testifying that he had not considered firing the DEBTOR after learning of her drug dependence because he hoped that she would recover and resume her role as a trusted and valued employee. Because the DEBTOR'S work schedule was approved by Dr. Petersen during the time he served as president of the GROUP, and the GROUP's admission, through Dr. Lubbers' testimony, that it was aware of the DEBTOR'S absences from work during 1998, when the DEBTOR continued to receive her full salary, including significant overtime, the GROUP has no claim against the DEBTOR for the compensation she has received. *See, Pfeiffer v. Hudson Manufacturing Co.,* 203 Ill.App. 364, 1917 WL 1883 (Ill.App. 1 Dist.1917).

As an off-shoot of its theory that the DEBTOR failed to diligently perform her duties, the GROUP asserts that she is liable for the losses it suffered as a result of the failure to timely bill insurance companies and other providers for services rendered by the GROUP. Maintaining that she was never forewarned that she would be personally responsible for unreimbursed billings and that no other employee had ever been held accountable for such losses, the DEBTOR disputes her liability for these amounts claimed by the GROUP.

In support of its position that the DEBTOR was not doing her job, the GROUP points to the low billings for the month of December of 1997 in the amount of $20,856.16, noting that when combined with the billings for the months of October of $94,580.18 and of November of $93,503.18, the combined billings total only $208,939.52, which is less than the amount billed in the previous month of September

of $225,612.36. The GROUP'S billings, month by month, from 1996 through mid-year 1999, were as follows:[4]

| MONTH | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|
| January | $293,903.67 | $208,897.60 | $332,440.65 | $175,540.77 |
| February | 299,477.03 | 165,848.76 | 158,764.70 | 312,942.25 |
| March | 165,416.97 | 322,562.91 | 85,149.83 | 299,040.26 |
| April | 147,117.09 | 190,592.20 | 171,151.75 | 286,652.52 |
| May | 230,816.83 | 59,192.73 | 338,878.06 | 219,887.56 |
| June | 214,837.21 | 174,667.47 | 363,455.62 | 259,202.67 |
| July | 161,963.56 | 197,924.77 | 225,251.67 | |
| August | 340,653.71 | 357,811.19 | 530,656.91 | |
| September | 98,810.87 | 225,612.36 | 573,975.88 | |
| October | 247,481.39 | 94,580.18 | 306,057.09 | |
| November | 199,774.33 | 93,503.18 | 246,414.96 | |
| December | 24,151.86 | 20,856.16 | 336,420.64 | |

In order to prevail, the GROUP must establish that under Illinois law, outside of bankruptcy, the DEBTOR would be liable for the losses resulting from the late billing. The record demonstrates that all of the physicians in the GROUP were aware in 1997 that a backlog in the billings had developed. Not only were the physicians aware of the problem, it was a topic of considerable concern at their meeting with their attorney in November, 1997. The physicians received no bonuses after the first quarter of 1997, as a result of the reduced revenues. In December, 1997, Dr. Lubbers had directed the DEBTOR to send him daily reports on the hospital billings completed, but he admitted that none were received. Despite their mounting apprehension, the physicians took no affirmative action to monitor the DEBTOR'S work.

This Court finds that the DEBTOR did not deliberately disregard any of her responsibilities. The DEBTOR testified that she performed the duties of her employment to the best of her ability and that she simply could not accomplish all of the tasks that were assigned to her as well as processing the hospital billing. When she left the GROUP, her work responsibilities were divided among several employees and it required considerable overtime hours on the part of two individuals over a six-month period to catch up on the billings.

As previously noted, the proof offered by the GROUP established, at most, poor job performance. Absent more, the GROUP has no remedy against the DEBTOR for lost profits. As explained by the court in *Fried v. Aftec, Inc.*, 246 N.J.Super. 245, 587 A.2d 290 (1991):

[A] contract for commercial employment requires nothing more than reasonable diligence ("standard care") on behalf of the employee to perform its terms. *See Restatement (Second) of Agency* § 379(1) (1958). Absent a special agreement, an employee whose best efforts resulted in poor performance, causing a loss of profits, does not become liable for such losses in a breach of contract action. An employer cannot give an employee negative fitness reports, retain the employee, and later sue him for failure to perform the agreement or for overall negligence or carelessness, allegedly causing the company financial losses. *Cf. Carmichael v. La-*

---

**4.** Those billings represent the work of four physicians, with the exception of the first six months of 1996, when the GROUP was comprised of only three physicians.

*vengood*, 112 Ind.App. 144, 44 N.E.2d 177, 180 (Ind.App.1942). The court there stated that in the absence of an express agreement by which the agent expressly agrees to be so bound, the agent is not an insurer of the success of his undertaking and he does not guarantee his principal against incidental losses, and if he acts with good faith and with due care he is not liable for losses which result from a mere mistake.

*And see United States Liability Ins. Co. v. Haidinger–Hayes, Inc.*, 1 Cal.3d 586, 83 Cal.Rptr. 418, 463 P.2d 770, 774 (1970). The employer's remedy is to fire the employee for ineptness or lack of diligence.

The result is the same under Illinois law. In order for an employer to recover consequential damages in the form of lost profits as a result of a breach of an employment contract, the profits must have been within the employee's contemplation when the contract was entered into. *Med+Plus Neck and Back Pain Center, S.C. v. Noffsinger*, 311 Ill.App.3d 853, 726 N.E.2d 687, 244 Ill.Dec. 712 (Ill.App. 2 Dist.2000).

Moreover, it appears to the Court that the DEBTOR, if in fact negligent in the performance of her duties, was not alone. The Court will not overlook the evidence of neglect on the part of the GROUP's management. It is clear that the ill feelings and lack of cooperation between the other physicians in the GROUP and Dr. Petersen interfered with the successful management of the practice. For that, the physicians themselves are at fault and the blame cannot be pinned on the DEBTOR. The management of the GROUP was in turmoil for at least the last six months of the DEBTOR'S employment. If the GROUP believed that the DEBTOR was not performing her job, its remedy would have been to discipline her or to terminate her employment with the GROUP. Be-

cause the new management did not believe that it had the right to do so without Dr. Petersen's approval, the decision was at an impasse, until the DEBTOR'S arrest and her voluntary termination. Under those circumstances, the GROUP cannot recover the amounts sought for billing losses from the DEBTOR.

Similarly, the GROUP'S claim that the DEBTOR is liable for the bank overdraft charges also fails. The DEBTOR, while admitting responsibility for the transfer of funds to the GROUP'S checking account, blamed the bank for failing to automatically transfer funds from the GROUP'S money market account to cover checks. At most, the charges were caused by ordinary negligence on the part of the DEBTOR. The DEBTOR was never advised by the GROUP that she would be held liable for such charges. Under Illinois law, the DEBTOR is not liable to the GROUP for the overdraft charges.

## 2. Dischargeability of the debt.

A. Section 523(a)(2)(A): Fraud

Section 523(a)(2)(A) excepts from discharge a debt

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).

Although Section 523(a)(2)(A) provides that a debt may be excepted from discharge on the independent grounds of fraud, false pretenses and false representation, courts have historically applied a singular test, requiring the creditor to establish: (1) the debtor made a representation to the creditor; (2) the debtor's representation was false; (3) the

debtor possessed *scienter*, i.e., an intent to deceive; (4) the creditor relied on the debtor's misrepresentation, resulting in a loss to the creditor; and (5) the creditor's reliance was justifiable. *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). The Seventh Circuit recently expanded the cause of action in *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir.2000), holding that "actual fraud" is broader than misrepresentation and includes any deceit, artifice, trick, or design involving direct or active operation of the mind, used to circumvent and cheat another. *Id.* at 893. In order to prove a claim based on actual fraud, the creditor must establish that: 1) a fraud occurred; 2) the debtor was guilty of intent to defraud; and 3) the fraud created the debt. *In re Jairath*, 259 B.R. 308 (Bankr.N.D.Ill.2001).

■ The DEBTOR admits that she made some personal purchases with the GROUP'S credit card and that she did not repay the GROUP for those purchases, though she maintains that at all times she intended to repay the GROUP the funds. At trial, the DEBTOR identified certain charges as personal and other charges as representing both personal and office purchases.[5] The DEBTOR'S testimony may be summed up as follows:

| Date | Vendor | Amount | Personal | Personal/Office |
|---|---|---|---|---|
| 05–21–97 | Miracle Car Wash | $ 12.45 | X | |
| 05–24–97 | Holiday World | 100.59 | X | |
| 06–11–97 | Helzberg Diamonds | 532.68 | X | |
| 07–08–97 | Disc Jockey | 55.13 | X | |
| 09–10–97 | Terry's Village | 46.75 | X | |
| 09–26–97 | Prime Sports | 48.70 | X | |
| 10–19–97 | Natural Nails | 23.00 | X | |
| 11–08–97 | Braun's | 254.60 | X | |
| 11–02–97 | Sam Goody | 31.78 | X | |
| 12–18–97 | Toys R Us | 187.52 | X | |
| 12–23–97 | Sears Roebuck | 221.80 | X | |
| 12–23–97 | Victoria's Secret | 196.10 | X | |
| 12–23–97 | Champs | 127.03 | X | |
| 12–23–97 | Coach House | 145.22 | | X |
| 12–28–97 | Coach House | 418.70 | | X |
| 1997 | The Art Place | 1,767.12 | | X |
| 1997 | Best Buy | 6,429.02 | | X |
| 1997 | Blockbuster Video | 62.36 | X | |
| 1997 | Electronics Boutique | 736.43 | | X |
| 1997 | GRC Vita Power Programs | 67.80 | X | |
| 1997 | Music World | 1,487.22 | X | |
| 1997 | Musicland | 85.21 | X | |
| 1997 | Kirlin's | 411.69 | | X |
| 1997 | Heart to Heart | 51.78 | | X |
| 1997 | GRC Proactive Solutions | 201.55 | X | |
| 1997 | Something Special | 119.16 | X | |
| 1997 | Trade Secret | 117.96 | X | |
| 1997 | Victoria's Secret | 285.58 | X | |
| 1997 | Von Maur | 563.65 | X | |
| 1997 | Younkers | 1,261.70 | X | |
| 06–09–98 | Disc Jockey | 98.77 | X | |
| 06–14–98 | Primetime 24 | 34.95 | X | |

**5.** At trial, the GROUP referred to additional charges which were handwritten on the recapitulation prepared by the GROUP. Unlike the other charges included on that summary, however, copies of the Visa statements showing those amounts were not included.

| | | | | |
|---|---|---|---|---|
| 12–16–98 | Kile's Hallmark Shop | 431.90 | | X |
| 12–16–98 | Heart to Heart | 187.20 | | X |
| 12–17–98 | Rolling Pin | 207.10 | X | |
| 1998 | The Art Place | 391.43 | | X |
| 1998 | Best Buy | 274.23 | X[6] | |
| 1998 | Electronics Boutique | 893.12 | | X |
| 1998 | GRC Proactive Solutions | 97.75 | X | |
| 1998 | Holland Jewelers | 3,759.76 | | X[7] |
| 1998 | Kirlin's | 74.83 | X | |
| 1998 | Music World | 645.53 | X | |
| 1998 | Something Special | 230.72 | X | |
| 1998 | Von Maur | 728.31 | | X |

The DEBTOR denied making any personal purchases at Jewel Food Store.

The DEBTOR testified that she was given a credit card for the GROUP'S Visa account in order to purchase items for the office, including food, office supplies, computer programs and gifts for the office staff. She testified that when she made purchases with the credit card she would make a copy of the original receipt and circle the office-related expenses, keeping that copy at the office. She would take the original receipt home and destroy it. The DEBTOR testified that she understood that she could use the credit card for personal purchases, on occasion, as long as she paid it back. She did not believe that she had to repay the GROUP right away, but recognized that she was not given an unlimited line of personal credit. The DEBTOR testified that she always intended to repay the personal charges, but became financially unable to do so after she left the GROUP'S employ.

In addition, the DEBTOR admitted that a series of "900 number" phone calls totaling $692.26, made by someone from her home on the telephone line paid for by the GROUP, were not business related.[8] The DEBTOR admitted that she was aware of the "900 number" calls, but, unable to stop them, continued to have the GROUP pay for them. Those personal phone bills were submitted to the GROUP by the DEBTOR, input into the computer by the DEBTOR, who then prepared checks in payment of those bills, and presented the checks to a physician for signing. Although the DEBTOR had no signatory authority, she maintained control and possession of the

6. Included in the documents supporting the Best Buy charges for 1998, is an original receipt for purchases made on February 20, 1998, totaling $560.22, which was retrieved by the detectives in the "trash search." The DEBTOR admitted that certain purchases including CDs, DVDs, and videos, totaling $274.23, including tax, were for her personal use. The DEBTOR identified charges for the office totaling $69.98, but could not identify the remaining charges. The total of the 1998 charges for Best Buy was $1,773.92.

7. After testifying that the charges incurred for purchases made at Holland Jewelers during 1998 were both for her personal use and for the office, the DEBTOR later admitted that she purchased several expensive items of jewelry from that store but specifically stated that she could not recall whether she used the GROUP'S card in making those purchases. With the exception of a diamond pendant purchased in May, 1998, for $1,013.60, the dates of the other purchases were not identified. The amounts of those purchases do not match the charges shown on the GROUP'S credit card statements for 1998. Without additional substantiation, the GROUP did not overcome the DEBTOR'S testimony that the charges of $3,759.76 represent both personal and offices purchases. The DEBTOR testified that those items of jewelry were later sold to Dr. Petersen. *See infra* p. 775.

8. Those charges were incurred on billing dates as follows: February 7, 1998—$5.70, $52.68 and $66.43; March 7, 1998—$16.02 and $97.41; and May 7, 1998—$456.24.

checks for the bank accounts at the GROUP. The DEBTOR denied using the phone lines to make other personal calls, though numerous calls appear on the billing statements. Those numbers were not tracked down by the GROUP.

Based on the DEBTOR'S admission that she used the GROUP'S charge card for personal purchases on numerous occasions, and her submission of the personal phone charges for payment by the GROUP, the GROUP contends that the full amount of the disputed credit card charges of approximately $36,571.94 is nondischargeable.[9] The GROUP asserts that the evidence, taken as a whole, shows that the DEBTOR used the charge card to support a shopping habit that was out of control. The testimony, however, showed only that some of the charges amounting to $7,754.20 were made for personal purchases.[10] The GROUP did not introduce evidence as to the remaining items purchased, claiming that its attempts to obtain this information were futile.[11] The GROUP admits that it cannot differentiate the personal charges from the office expenditures, and that it has not amended its tax returns filed for those years. A determination that the creditor has met the burden of proof with respect to certain separate instances of fraud, however, will not cause an entire series of transactions to be determined to be nondischargeable. *In re Luster*, 2001 WL 34059292 (Bankr. S.D.Ill.2001), *aff'd* 50 Fed.Appx. 781, 2002 WL 31470382 (7th Cir.(Ill.) 2002). The

GROUP'S presumption that all of the charges made on the account were for personal purchases by the DEBTOR is not justified. The burden to prove which charges were personal is on the GROUP and the GROUP admits it was unable to acquire the necessary evidence. Based on this Court's determination that the DEBTOR is indebted to the GROUP in the amount of $8,446.46, representing the personal charges admitted by the DEBTOR and the charges for the "900 number" calls made at her residence, the DEBTOR'S objection to Claim #8 filed by the GROUP will be sustained in part and an order allowing the claim in that amount will be entered in the main case proceeding.

Turning to the dischargeability of that debt, ample circumstantial evidence supports the GROUP'S contention that the DEBTOR intended to deceive the GROUP, never planning to repay the personal charges. When the DEBTOR furnished the monthly reports to the accountant, she never advised him that some of the expenses were personal. Nor did the DEBTOR, after Dr. Weimer's death, inform any of the physicians of her use of the card while she was working for the GROUP. The DEBTOR never made a single repayment while she was employed by the GROUP despite earning substantial amounts of overtime pay. Although the DEBTOR maintained that she kept a separate file in her desk identifying the personal charges, none was discovered when

9. This total is calculated from the exhibits introduced at trial, but does not include the handwritten figures contained on the recapitulations prepared by the GROUP for each vendor, for those amounts appear to be without supporting documentation. *See* n. 5, *infra*. Given the result reached by this Court, the exact total of all of the charges made by the DEBTOR on the GROUP'S credit card need not be determined.

10. The GROUP categorized the credit card charges by vendor. The DEBTOR testified that many of the credit card charges to a particular vendor consisted of both personal and business purchases, which, several years after the fact, she could not distinguish.

11. Dr. Engebrecht testified that the GROUP contacted Best Buy and The Art Place, but those merchants were unable or unwilling to track down the original receipts.

she left. It was only after she left that she told Dr. Petersen. The DEBTOR'S nondisclosure is evidence of her intent to defraud. Most telling, in the Court's view, is the contemporaneous improper coding of all of the personal charges as office expenses, in order to conceal her actions from the accountant. Accordingly, this Court determines that the debt found owing to the GROUP in the amount of $8,446.46 is nondischargeable under Section 523(a)(2)(A).

The DEBTOR contends that she is entitled to a credit of $2,763.52 for a payment made on July 8, 1998, to VISA. A check evidencing that payment was introduced into evidence. Because the GROUP'S account statement dated June 17, 1998, shows a balance due on the account of $2,020.54, the GROUP questions whether this payment to VISA was made on its account, or on another account of the DEBTOR. The statement for the prior month, dated May 17, 1998, showed a previous balance of $2,967.46 and a current balance due of $2,370.55. The DEBTOR maintained, however, that the payment was made on the GROUP'S account, but a credit for that amount does not appear on the account statements. The DEBTOR has failed to trace the payment to the GROUP'S account and her request for a credit will be denied.

### 3. Section 523(a)(4) [12]

Section 523(a)(4) excepts from discharge debts resulting from "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). This exception to discharge is based on (1) fraud or defalcation while acting in a fiduciary capacity, or (2) embezzlement or larceny. Because the GROUP does not identify the basis of its claim, the Court will address each.

The concept of a "fiduciary relationship" under Section 523(a)(4) is a matter of federal law and the broad, general definition under state law, as one involving confidence, trust and good faith, is not applicable in the dischargeability context.[13] It is well established that the term applies only to a fiduciary under an express or technical trust, which must exist prior to, or independent of, the transaction from which the contested debt arose. *In re Cochrane*, 124 F.3d 978 (8th Cir.1997). The Seventh Circuit Court of Appeals expressed its approval of this narrow interpretation of fiduciary in *Matter of Marchiando*, 13 F.3d 1111, 1116 (7th Cir.1994), defining a fiduciary relationship as "a difference in knowledge or power between fiduciary and principal which ... gives the former a position of ascendency over the latter." Further delineating the definition of a fiduciary relationship for purposes of Section 523(a)(4), the Seventh Circuit held that a 50% shareholder and chief operating officer of a closely held corporation who could not, under the terms of the shareholder agreement, be removed without his

**12.** Given the determination that the DEBTOR is not indebted to the GROUP for anything other than the creditcard and phone charges of $8,446.46, nondischargeable under Section 523(a)(2)(A), it would not be necessary to consider the GROUP'S alternative theories under Sections 523(a)(4) and (a)(6). Even if the determination that no other debt exists is in error, as demonstrated in the ensuing discussion, the evidence was not sufficient to establish nondischargeability under those sections.

**13.** Under Illinois law, a manager owes a fiduciary duty to an employer. *McLaughlin v. Chicago Transit Authority*, 243 F.Supp.2d 778 (N.D.Ill.2003). Although the DEBTOR was in charge of the day-to-day operations of the office, there was no evidence to suggest that she exercised "domination and control" over the GROUP.

consent, possessed substantial power over the other two shareholders, which gave rise to a fiduciary relationship. *In re Frain*, 230 F.3d 1014 (7th Cir.2000).

■ In general, an employee/employer relationship is insufficient to constitute a fiduciary relationship under Section 523(a)(4). *In re Magisano*, 228 B.R. 187 (Bankr.S.D.Ohio 1998); *In re Luppino*, 221 B.R. 693 (Bankr.S.D.N.Y.1998) (rejecting the view that an employment relationship is within Section 523(a)(4) when the employee has control over corporate funds); *In re Trovato*, 145 B.R. 575 (Bankr.N.D.Ill.1991). Unlike the shareholder and chief operating officer in *Frain*, the DEBTOR did not occupy a position of ascendency over the GROUP. The DEBTOR was not a fiduciary vis-a-vis the GROUP, and the GROUP has no claim on that basis under Section 523(a)(4).

■ Embezzlement under Section 523(a)(4) is defined as the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come. *Matter of Weber*, 892 F.2d 534 (7th Cir. 1989). It requires fraud in fact, involving moral turpitude or intentional wrong, rather than implied or constructive fraud. *U.S. Life Title Ins. Co. of New York v. Dohm*, 19 B.R. 134 (N.D.Ill.1982). Embezzlement, requiring *mens rea*, is to be distinguished from mere breach of contract. *In re Hofmann*, 144 B.R. 459 (Bankr. D.N.D.1992), *aff'd*, *Werner v. Hofmann*, 5 F.3d 1170 (8th Cir.1993). Differing from embezzlement, larceny requires a showing that the debtor wrongfully took property with fraudulent intent to convert it to its own use without the owner's consent. *Matter of Rose*, 934 F.2d 901 (7th Cir. 1991). Where an employee's possession of an employer's funds is lawful in the first instance, embezzlement is the appropriate exception. In order to prevail, the creditor must show that the debtor appropriated the funds with fraudulent intent. *Weber*, 892 F.2d at 538.

■ Here, the DEBTOR'S compensation was paid according to procedures established by the GROUP, albeit with a lack of verification of the DEBTOR'S overtime hours. As set forth above, the GROUP failed to prove any intentional wrongdoing by the DEBTOR with respect to her pay. Also, as set forth above, the evidence supports the conclusion that the DEBTOR made numerous personal purchases with the GROUP'S credit card, and charged unauthorized phone calls to the GROUP, with no present intent to repay the GROUP for those charges. The Court views that conduct as in the nature of a breach of contract that, while amounting to fraud under Section 523(a)(2)(A), does not rise to the level of embezzlement or larceny. The GROUP has failed to prove its claim under Section 523(a)(4).

### 4. Wilful and malicious injury—Section 523(a)(6)

■ Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The GROUP must establish that the DEBTOR has a debt to the GROUP for (1) willfully and maliciously (2) injuring (3) the GROUP'S property. The GROUP bases its claim under this exception upon its assertion that the DEBTOR deliberately refused to submit the billings on time and that she actively misrepresented the various deadlines for billing. In order to prevail, the GROUP must establish by the preponderance of the evidence both a "willful" and "malicious" injury. A willful injury must be a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. *Kawaauhau v. Geiger*, 523 U.S.

57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). A showing that her actions were merely careless, negligent or even reckless, is insufficient to establish a willful and malicious injury under Section 523(a)(6). *In re Dobek,* 278 B.R. 496 (Bankr.N.D.Ill.2002). "Malicious" means a conscious disregard of one's duties or without just cause or excuse; it does not require ill will or a specific intent to do harm. *Matter of Thirtyacre,* 36 F.3d 697, 700 (7th Cir.1994).

■ There was no evidence adduced at trial that the DEBTOR deliberately failed to submit the GROUP'S billings to the third party providers. Moreover, according to Dr. Engebrecht's testimony, it was Dr. Petersen, and not the DEBTOR, who made representations to the other physicians at the November, 1997, meeting and at the May, 1998, meeting, that the GROUP was not running up against any deadlines. The DEBTOR was not present at the November meeting. The DEBTOR was present at the May meeting, but did not correct Dr. Petersen's statement. Dr. Petersen emphatically testified that the DEBTOR made diligent effort to bring the billings current. After the DEBTOR left, the responsibility of catching up the hospital billing was given to another employee, who worked twelve hours a day, five days a week, from July to December, in order to eliminate the billing backlog. She did not accomplish that task alone, but with the assistance of another billing clerk who also worked evenings.

Moreover, the GROUP failed to establish a motive for the DEBTOR to cause financial harm to her employer. The DEBTOR was a long-term employee whose contributions to the GROUP were substantial and valued. Although toward the end of her term, the DEBTOR felt she was overworked and under great stress, there was no evidence of any personal animosity by the DEBTOR toward the GROUP or any of the physicians. Given the amount of overtime pay the DEBTOR was receiving, if anything, she would have an incentive to maximize the GROUP'S income, not minimize it.[14]

Based on all of the evidence, the Court concludes that the GROUP failed to prove its claim under Section 523(a)(6).

■ In its prayer for relief in the Complaint objecting to the dischargeability of its debt, the GROUP also seeks an award of prejudgment interest, costs, punitive damages and attorney fees. The award of prejudgment interest is a matter left to the sound discretion of the trial court. *In re Acequia, Inc.,* 34 F.3d 800, 818 (9th Cir.1994); *Michaels v. Michaels,* 767 F.2d 1185, 1203 (7th Cir.1985). Prejudgment interest is appropriate when the plaintiff has been wrongfully deprived of its money. It is presumptively available in cases governed by federal law, including cases under Section 523 of the Bankruptcy Code. *In re Glatstian,* 215 B.R. 495, 497 (Bankr.D.N.J.1997). The rate of prejudgment interest in nondischargeability actions is calculated pursuant to 28 U.S.C. § 1961. *In re Senese,* 245 B.R. 565, 578 (Bankr.N.D.Ill.2000). The interest accrues from the date that the wrongful deprivation began. *Glatstian,* 215 B.R. at 498.

14. This Court finds that it strains credibility that the DEBTOR, as alleged by the GROUP, would systematically engage in a course of conduct intended to drive the GROUP into financial ruin by failing to complete the billing on a timely basis, while at the same time milking the GROUP by receiving unmerited overtime and making unauthorized use of the GROUP'S credit card. Rather, this Court finds that the DEBTOR, confronted with an increasing workload and mounting responsibilities, and hampered by her increasing dependence upon prescription narcotics, became considerably less efficient and simply failed to perform her job at the levels expected by the GROUP.

■ There was no evidence adduced at trial as to when the DEBTOR'S obligation to repay the GROUP for her personal phone charges and personal charges on the GROUP'S credit card accrued. The latest possible date is the date of the DEBTOR'S separation from employment, July 21, 1998, which is the date that this Court will use in the absence of any evidence establishing an earlier date. Under 28 U.S.C. § 1961, the applicable rate of interest as of that date is 5.375%. Interest at that rate from July 20, 1998 through the date of this judgment on the amount of $8,446.46 is $2,267.51. The GROUP is also entitled to an award of costs.

■ The GROUP'S request for punitive damages and attorney fees, however, will not be allowed. Under the Supreme Court's decision in *Cohen v. de la Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998), an award of punitive damages on a fraud claim is nondischargeable. An award of punitive damages is only proper under Illinois law in cases of intentional and outrageous misconduct. *Jannotta v. Subway Sandwich Shops, Inc.*, 125 F.3d 503 (7th Cir.1997). This is not such a case. No exceptional circumstances exist here which would justify an award of punitive damages. A prevailing creditor may not recover attorney fees in a dischargeability proceeding, absent a statutory or contractual basis for rendering such an award. *In re Atchison*, 255 B.R. 790 (Bankr. M.D.Fla.2000). Here, the GROUP is not relying on a state court award of attorney fees nor has it identified a contractual or statutory basis for an award of fees. Accordingly, its request for attorney fees is denied.

**DISCHARGE**

■ In order to effectuate the fresh start policy of the bankruptcy laws, objections to discharge under Section 727 of the Bankruptcy Code are liberally construed in favor of debtors and strictly against creditors. *Matter of Juzwiak*, 89 F.3d 424 (7th Cir.1996). Notwithstanding that rehabilitative policy, it is only the honest but unfortunate debtor that is entitled to a discharge. *Matter of Birkenstock*, 87 F.3d 947 (7th Cir.1996). Grounds for denial of discharge must be established by a preponderance of the evidence. *In re Scott*, 172 F.3d 959 (7th Cir.1999).

**1. Section 727(a)(2)**

■ Section 727(a)(2) of the Bankruptcy Code provides that:

(a) The court shall grant the debtor a discharge, unless-

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed–

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2). To prevail under this exception, a creditor must prove:

1. That the act complained of was done within the one year period prior to the date of the filing of the petition;

2. That the act was done with the actual intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of the property under the Bankruptcy Code;

3. That the actor was the debtor or his duly authorized agent; and

4. That the act consisted of transferring, removing, destroying or concealing any of the debtor's property,

or permitting any of those acts to be done.

*In re Handel,* 266 B.R. 585 (Bankr. S.D.N.Y.2001).

■ The GROUP alleges that the DEBTOR concealed or removed clothing or other personal property. The DEBTOR filed her Chapter 7 petition on November 13, 2000. The GROUP does not specifically identify any acts committed by the DEBTOR during the year immediately preceding that date. The DEBTOR and Dr. Petersen were married in August, 1999, prior to the one-year period which the exception places in issue. She moved into his home, which was fully furnished. The DEBTOR had sold her home earlier that year. The sale of her personal property, including furniture and household goods, and personal effects to Dr. Petersen had also occurred in February of that year. Much ado was made by the GROUP at trial concerning the discovery of numerous items of clothing by the detectives in their "trash search" at the DEBTOR'S residence in the spring of 1998, prior to her arrest. All of those actions, however, occurred outside the relevant time frame for Section 727(a)(2). The only evidence adduced at trial concerning any transfer, removal, destruction, or concealment of property by the DEBTOR is her admission that she sold a dining room set in late 1999 to a relative of her sister-in-law and a living room set to a stranger in early 2000. The DEBTOR testified that she did not get a good price for either item, as is not uncommon in the sale of used furniture. The GROUP made no showing that the DEBTOR had the requisite intent to defraud her creditors when she made these sales.

**2. Section 727(a)(3)**

■ Section 727(a)(3) of the Bankruptcy Code provides that:

(a) The court shall grant the debtor a discharge, unless-

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3). The Court of Appeals for the Seventh Circuit pinpointed the target of this provision in *In re Scott,* 172 F.3d 959 (7th Cir.1999), stating:

[T]he principal concern of § 727(a)(3) is debtors who destroy or hide their records. Moreover, most bankruptcies are consumer-type bankruptcies with no assets or business affairs to speak of, and therefore, the complexity of their business transactions do not implicate § 727(a)(3). But where debtors are sophisticated in business, and carry on a business involving significant assets, creditors have an expectation of greater and better record keeping.

*See, also, Union Planters Bank, N.A. v. Connors,* 283 F.3d 896 (7th Cir.2002). This provision was not meant to bar the discharge of the ordinary consumer debtor. *See, In re Buzzelli,* 246 B.R. 75 (Bankr.W.D.Pa.2000) (typical consumer debtor should not be denied discharge absent a "sudden and large dissipation of assets"). On that basis alone, this Court could deny the GROUP'S objection.

The focal point of the GROUP'S contention that the DEBTOR'S discharge should be denied under this exception is that she failed to keep records concerning her $70,000.00 in credit card debt. A comparison between the DEBTOR'S schedules, the schedules from Daniel Boone's bankruptcy filing, and the judgment of dissolu-

tion discloses that most of the credit card debt listed on the DEBTOR'S bankruptcy schedules was incurred during her first marriage, prior to the divorce in December, 1997. The DEBTOR testified that her first husband retained possession of those records after the divorce. In addition, this Court notes that the DEBTOR was required to make a lump sum payment of $30,000.00 to her former husband at the time of the divorce.

The GROUP also relies on the statements from the DEBTOR'S checking account, calling attention to the large checks paid to the DEBTOR by Dr. Petersen, from the time of their marriage until the filing of the bankruptcy. The DEBTOR explained that the monies were for payment of household expenses, and denied that she used any of these funds to acquire personal assets which she failed to report in her bankruptcy.

There is no basis in the evidence to support the GROUP'S assertions of the DEBTOR'S hidden personal property caches. Rather, the unfortunate truth appears to be that the DEBTOR, despite the GROUP'S incredulity in the matter, indeed has nothing to show for the significant debt which she incurred. The DEBTOR'S failure to maintain her credit card receipts for consumer purchases, standing alone, cannot result in denial of her discharge under this provision.[15]

### 3. Section 727(a)(4)(A)

■ Section 727(a)(4)(A) provides:

(a) The court shall grant the debtor a discharge, unless–

(4) the debtor knowingly and fraudulently, in or in connection with the case–

(A) made a false oath or account.

11 U.S.C. § 727(a)(4)(A). A debtor's duty to fully and accurately disclose all legal or equitable interests in property on the bankruptcy schedules is paramount and absolute. *Matter of Yonikus*, 996 F.2d 866 (7th Cir.1993). A debtor's duty of full disclosure imposes an uncompromising duty to carefully and truthfully answer all questions presented in the bankruptcy schedules and the Statement of Affairs. *In re Famisaran*, 224 B.R. 886 (Bankr. N.D.Ill.1998). The very integrity of the bankruptcy court and the successful administration of the bankruptcy system rest upon compliance with the debtor's obligation of disclosure.

■ In order to prevail on an objection to discharge under this provision, a creditor must establish five elements: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knows the statement was false; (4) the statement was made with the intent to deceive; and (5) the statement related materially to the bankruptcy case. *In re Sholdra*, 249 F.3d 380 (5th Cir.2001); *In re Bostrom*, 286 B.R. 352 (Bankr.N.D.Ill. 2002), *aff'd, Stathopoulos v. Bostrom*, 2003 WL 403138 (N.D.Ill.2003). A false oath is material if it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *In re Bailey*, 147 B.R. 157, 162 (Bankr.N.D.Ill.1992).

■ The GROUP asserts that the DEBTOR knowingly and fraudulently made a number of false oaths in connection with her bankruptcy petition. First, the GROUP points to the DEBTOR'S failure to list the litigation pending between the

---

**15.** Other decisions such as *In re Senese*, 245 B.R. 565 (Bankr.N.D.Ill.2000), also involving a debtor's failure to retain credit card statements are distinguishable. For instance in *Senese*, the debtor did not furnish bank account records and failed to offer any justification for the lack of records.

parties in paragraph 4 of the Statement of Financial Affairs, which requires a debtor to disclose all pending suits to which the debtor is a party. The listing of pending litigation on the Statement of Affairs serves the important purpose of alerting the trustee and affording him an opportunity to examine the proceeding in order to determine if unreported assets may exist. *In re Holstein,* 272 B.R. 463 (Bankr. N.D.Ill.2001). Though the DEBTOR did not list the pending litigation, in which she is a Defendant, not a Plaintiff, in the Statement of Affairs in response to paragraph 4, she did list the GROUP on Schedule F as holding an unsecured claim, referencing the existing litigation. By so doing, this Court finds that the Trustee and other creditors were put on sufficient notice and that the DEBTOR'S disclosure of the pending lawsuit, albeit not technically complete, was adequate.

In addition, the GROUP contends that the DEBTOR'S failure to disclose any amounts in response to paragraph 3, which directs a debtor to list all payments aggregating more than $600.00 within ninety days of the filing of the petition as well as payments made to insiders within one year of the petition date, constitutes a false oath. At trial, the DEBTOR admitted that she had made several payments in excess of $600.00 within the ninety days preceding the bankruptcy which were not disclosed. The DEBTOR paid $1,325.00 for boarding expenses for a horse. The DEBTOR also made two regular monthly payments totaling $700.00 to Express and two regular monthly payments totaling $650.00 to Victoria's Secret, paying those accounts in full. The DEBTOR admitted that she paid Fountainhead Tack, a store specializing in equestrian gear, a total of $1,129.61, but claimed that she had purchased the items for her son's former fiancee and received repayment prior to filing bankruptcy. In addition, the DEBTOR wrote a check in the amount of $831.60 for the purchase of a wedding dress and a check in the amount of $1,675.00 for rent for her son and his fiancee, claiming to have been paid back in cash soon thereafter. The DEBTOR explained that neither her son nor his fiancee had a checking account.

The GROUP also contends that the DEBTOR failed to disclose any gifts or other transfers which she made within the year preceding the bankruptcy, but there was no evidence introduced of any substantial gifts or transfers made within that year.

The GROUP contends that the DEBTOR did not make a complete disclosure of her household goods and other personal effects and that she undervalued her wearing apparel. At trial, the DEBTOR admitted that she had purchased a horse for $1,200.00 within the ninety days preceding bankruptcy, which she failed to include on her schedule of personal property.

This Court finds that any omissions or errors in the DEBTOR'S bankruptcy petition were not knowingly and fraudulently made. Moreover, this case involves a small number of inadvertent omissions. It is, as characterized by one court, a case where "a particularly aggressive creditor flyspecked [the debtor's] papers looking for problems, finding minor immaterial issues to complain about." *In re Sharp,* 244 B.R. 889, 894 (Bankr.E.D.Mich.2000). The DEBTOR testified that she brought certain errors in her bankruptcy papers to the attention of the office staff of her bankruptcy counsel but that the corrections were not made before the petition was filed. Though the DEBTOR'S testimony suffered from minor inconsistencies and her memory was, on occasion, conveniently poor, the DEBTOR did not strike the Court as a dishonest and deceitful

person. Rather, she appeared to have been affected by her extended drug use and ongoing emotional instabilities. The preparation of the DEBTOR'S schedules may have been somewhat sloppy and careless, but that alone is not sufficient to bar her discharge.

As a final point, bank records produced by the GROUP on the eve of trial disclosed that a deposit of $2,000.00 was made to the DEBTOR'S checking account on the date the petition was filed, and that her correct checking account balance at the end of the banking day on November 13, 2000, was $3,337.74.[16] The balance in the checking account was $6.87 on November 8, 2000. Two deposits were made on November 10, 2000, one in the amount of $1,400.00 and one in the amount of $2,000.00. On that same day, a draft in the amount of $263.73 was paid. Since the trial, the Chapter 7 Trustee sought and has received the excess funds in the account. The DEBTOR has fully cooperated with the Trustee.

The evidence does not support a finding that the DEBTOR intentionally and fraudulently under-reported the balance in her checking account. At trial, the DEBTOR testified that after their marriage, Dr. Petersen would give her funds to maintain the household. She would deposit the checks into her account, disbursing the money to meet household expenses. In her mind, the money did not belong to her, and was already accounted for.

**4. Failure to satisfactorily explain loss of assets: Section 727(a)(5).**

Under Section 727(a)(5), the right to a discharge is forfeited if "the debtor has failed to explain satisfactorily ... any loss of assets or deficiency of assets to meet

the debtor's liabilities." 11 U.S.C. § 727(a)(5).

The GROUP contends that the DEBTOR has failed to satisfactorily explain what happened to the assets purchased through her credit cards. The first step in prevailing under this exception to discharge is to establish that the debtor owned identifiable items of substantial value which were not included in the bankruptcy estate. *In re Bostrom, supra.* This Court finds that the GROUP does not make it past this point.

### CONCLUSION

With respect to the GROUP'S cause of action under Section 523, the GROUP carried its burden of proof only as to credit card and phone charges totaling $8,446.46, determined nondischargeable under Section 523(a)(2)(A), with prejudgment interest awarded of $2,267.51. With respect to its cause of action under Section 727, the GROUP failed to sustain its burden of proof and the DEBTOR'S discharge will not be denied.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. Separate Orders will be entered.

---

**16.** The beginning balance on that date was $3,130.84. In addition to the deposit of $2,000.00, drafts were paid in the following amounts: $72.45; $100.00; $140.07; $500.00 and $980.58.